Filed 12/6/13

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　　　v.<br><br>MANUEL ALFRED ROCHA,<br><br>　　　Defendant and Appellant. | H038703<br>(Santa Clara County<br>　Super. Ct. No. C1103705) |


A jury convicted defendant Manuel Alfred Rocha of residential burglary and interfering with a police officer based on evidence that he entered a homeowner's garage and carried away an impact wrench belonging to the homeowner. On appeal his chief contention is that the court erred in admitting evidence of a 2009 burglary, also of a residential garage, to show that defendant committed the present burglary with the requisite larcenous intent. Defendant contends that the circumstances of the earlier burglary were too dissimilar from the charged offense for it to possess substantial probative value, and that its potential for prejudice preponderated over whatever probative value it might have. He also contends, and respondent concedes, that the trial court overstated the time to be deducted from defendant's credit for presentence confinement due to a contemporaneous parole hold. We will direct a modification of the judgment to award additional credit, but will otherwise affirm the judgment.

BACKGROUND

Around 8:00 on the morning of Saturday, March 26, 2011, Gilberto Gonzales, as was his custom, opened the door of the garage attached to his San Jose home. The garage was used to do laundry as well as to store personal property, including many tools Mr. Gonzalez owned for working on cars and in construction. He usually left the door open when he was home. Toward noon he drove to the auto parts store.[1] A few minutes later, his wife Denise and daughter Bianka stepped out of the house to have a smoke.[2] Almost as soon as they did, Bianka heard a noise in the garage. Bianka described the sound as "[l]ike going through things; making noises, closing and opening doors," also "like people scattering things, opening drawers." She thought the noises were being made by her father, which was odd because he had "just left." Meanwhile Denise saw the "shadow of a person" in the corner of the garage. She too thought her husband had returned, so she went back into the house on the way to the back yard, because her husband did not like smoking in front of the house.

Bianka reentered the house and opened a door connecting into the garage, apparently expecting to see her father. Instead she saw defendant, a complete stranger, standing about 10 feet away, "opening drawers." He turned to look at her; neither of them spoke. According to Denise, Bianka called out that someone other than her father was present. She ran to the phone and called 911. While on the phone, she went out the front of the house and saw defendant emerge from the garage and walk down the driveway and then the street. He appeared to be holding a bulky boxlike object to his chest, apparently wrapped in a sweater or jacket. He was walking slowly. He seemed

---

[1] Mr. Gonzales initially thought it might have been around 9:00 in the morning, but agreed that it "might have been" more like 11:30 a.m., which is apparently more consistent with police dispatch records.

[2] Denise testified that she stepped outside alone.

"calm, cool, collected." He also struck her as "disorientated," though she could not describe this impression more particularly. She thought he was on drugs. She was familiar with people who use methamphetamine and had seen them under its influence, though she had no formal training in its effects.

Bianka described the intruder to the 911 operator, who relayed it in turn to San Jose Police Officer Cooley, who was patrolling in the area. Within 10 minutes, he saw defendant—who matched the description—in a trailer park a few blocks from the Gonzalez home. Defendant was carrying a black case resembling a lunch pail. Officer Cooley followed him into the mobile home park. When defendant saw him, he froze, and then—disregarding Officer Cooley's command to stop—bolted, dropping the case to the ground. Additional officers were summoned to surround and search the mobile home park. About an hour later, they found defendant standing inside a metal shed. In the shed they also found a pair of pliers and a screwdriver. Officer Cooley did not perceive defendant as "disorientated," confused, paranoid, hallucinating, delusional, or exhibiting other physical or mental signs of being under the influence of methamphetamine. From Officer Cooley's experience, defendant "had the loo[k] of like he was caught."

About 15 minutes after defendant was captured, San Jose Police Officer Vela brought Bianka to the mobile home park for an in-field showup. She saw defendant standing by a police car in handcuffs. She apparently identified him as the man she had seen in the garage.[3]

---

[3] Although one of the prosecutor's questions to Bianka obliquely assumed that she had in fact identified the suspect as the man she saw in the garage, the prosecutor neglected to directly ask her whether that was the case. Officer Vela was asked, "[D]id Ms. Gonzales provide you any identification," to which he answered, "Yes." But when he was asked, "What did she say," his answer, as transcribed, was this: "[W]hen I asked her if that was the individual that we were detaining? And her immediate response was, yeah, that's him." Whether or not this was his actual testimony, the jury could reasonably infer from the evidence as a whole that Bianka identified defendant as the man she saw in the garage.

Defendant was taken into custody by San Jose Police Officer Jennings, who had arrived at the scene of the capture almost immediately after it occurred. Defendant initially refused to identify himself to Officer Jennings, but did so after the officer explained that since he was going to be fingerprinted and identified anyway, he should "just avoid the delay and let us know who you are."[4] Maybe 10 to 15 minutes elapsed between his initial refusal and the yielding of his identity. During this time he sat in the back of Officer Jennings's patrol car. He seemed calm and resigned, exhibiting no signs of mental or emotional upset. The same was true during the 10 minutes it took Officer Jennings to drive him to the "preprocessing center," and once there, throughout the officer's questions about things like his address and occupation. Nor did he exhibit any untoward behaviors while a phlebotomist took a blood sample. In total Officer Jennings spent perhaps four hours in defendant's presence. Defendant might have exhibited some symptoms consistent with methamphetamine intoxication, but the officer did not see anything that would have led him to charge defendant with being under the influence. In particular, defendant had dry mouth, but while this was consistent with present methamphetamine use, it could also be explained by past or chronic use, or the use of other drugs. Methamphetamine remains detectable in the blood for 24 hours after ingestion and in the urine for four days.

The case defendant had abandoned contained a tool variously referred to in the record as an impact wrench or drill. Officers showed this to Mr. Gonzalez, who said it was his. He said the pliers were not his. He initially identified the screwdriver as his. But when it was shown to him at trial, he denied that it was his.

---

[4] Defense counsel twice asked questions insinuating that defendant might have professed to be unable to remember his name. However, no evidence to that effect was adduced.

After the incident it appeared that several things in the garage had been moved, presumably by the intruder. A bike, normally kept near a washer and dryer along the back wall of the garage, had been left near the main garage door. The bike was not functional, having a broken chain. A "TV screen box," also previously located near the back of the garage, was found next to the bike. Some tools normally kept on top of a desk or dresser near the center of the garage had been scattered, and various cabinets and drawers were open.

It was stipulated that a blood sample drawn from defendant about 2:45 p.m. on March 26th, 2011, tested positive for amphetamine and methamphetamine.

A search incident to defendant's arrest yielded a Costco membership card in the name of Curtis Pembrook. Mr. Pembrook testified that the card had been in his wallet when the wallet and his cell phone were taken from his car by persons unknown while the car was parked in front of his home on the morning of February 17, 2011.

Defendant was charged with (1) first degree burglary of an inhabited dwelling house (Pen. Code, §§ 459, 460, subd. (a)), with an allegation that the house was occupied at the time of the burglary (*id*., § 667.5, subd. (c)(21)); (2) receiving stolen property (Pen. Code, § 496, subd. (a)); and (3) obstructing an officer (Pen. Code, § 148 , subd. (a)(1)). It was further alleged, by way of enhancement and to establish ineligibility for probation, that defendant had previously been convicted of first-degree burglary and of grand theft, and that he was on both parole and probation when he committed the charged offenses.

The jury found defendant guilty of first-degree burglary and obstructing an officer, but not guilty of receiving stolen property. Defendant made a motion to strike his prior conviction for first-degree burglary under *People v. Romero* (1996) 13 Cal.4th 497. The court granted the motion for reasons stated in a written decision. The court sentenced defendant to the lower term of two years, plus a five-year enhancement under Penal Code

5

section 667, subdivision (a).  The court allowed credit for presentence confinement of 376 actual days plus 49 days conduct credit.  Defendant filed this timely appeal.

DISCUSSION

## I.  Evidence of Prior Burglary

### A.  Background

Prior to trial the prosecutor moved to admit, and defendant moved to exclude, evidence of a 2009 burglary in which defendant was found to have stolen two pairs of speakers from a residential garage in Gilroy.  The trial court ruled that evidence of the prior burglary was admissible to show that defendant possessed the intent to steal when he entered the Gonzalez garage.  The court observed that both crimes "involv[ed] single family residences, entering through an open garage door, taking property from the garage."  In addition, both offenses "occur[red] during the daytime when the resident was home."  "All these factors," the court found, "support a strong inference that the defendant probably harbored the same intent in each instance."  The court further found that the evidence possessed substantial probative value that was "not substantially [out]weighed by any prejudicial effect, nor would it require undue consumption of time, nor is it likely to confuse the issues or mislead the jury."  Accordingly, the court concluded, "the uncharged theft related offense may be admitted to prove intent."

At trial Michael Loebs testified that in the early afternoon of  November 13, 2009, he noticed a van driving slowly up and down the street in front of his Gilroy home.[5]  He worked in loss prevention, and the van's behavior made him suspicious.  He went out of the house and got into his car where he watched a man whom he "knew didn't belong there" going in and out of the garage attached to the home of his neighbor, Michael Johnson.  He was unable to identify defendant as the man at trial, but at the time of the

_____

[5]  So he first testified.  When asked on cross-examination whether the van was "driving back and forth on your street," he said, "It was driving in one direction."

6

event he described the man as an adult Hispanic male. He saw the man make four of five trips from the garage to the van, carrying items including two speakers and a gray box. He took down the van's plate number. A couple minutes after the man left, Mr. Johnson arrived and Mr. Loebs asked him if somebody was supposed to be going through his garage grabbing stuff. Johnson checked his garage, then called 911. Perhaps 15 minutes later, an officer arrived and drove Mr. Loebs to a location about three blocks away, where he identified defendant as the intruder. He also identified a van as the one driven by the intruder. He later learned that the name of the intruder was Manuel Rocha.

Michael Johnson testified that a night or two before November 13, 2009, a washing machine had flooded his garage, forcing him and his family to remove everything from the garage and dispose of items, such as carpet, that were ruined. In the early afternoon of November 13, he went to the hardware store to work on some shelving that had been made accessible by the evacuation. He left the garage door open. Before he returned he got a phone call from a neighbor asking if he had hired someone to haul material out of his garage. He raced home to check on his sick daughter, whom he had left there alone, and then he called the police. Later he went to where the intruder had been apprehended, and he recognized a grey box containing Polk Audio speakers and a white box containing Pioneer speakers, both of which were items he had moved earlier that day.

Defendant had been apprehended while driving a van about seven minutes after the Johnson burglary was reported, and six to eight blocks from its location, by Gilroy Police Officer Basuino.[6] Mr. Johnson came to the scene and identified two speaker boxes

---

[6] The name appears as "Basuino" in the reporter's transcript's table of contents and throughout the clerk's transcript. When defense counsel asked the witness how to pronounce his name, the answer (as transcribed) was "Bas-suino." This did not deter the reporter from rendering the name throughout his testimony and closing argument as "Bausino."

7

in the van as his.  At some point defendant told Officer Basuino that "he buys tools cheap and resells them."[7]

It was stipulated that defendant was charged with first degree burglary in connection with the 2009 incident and was convicted of that charge in June 2010 on a plea of no contest.

The jury was instructed that if it found defendant had committed the 2009 burglary, it could "consider that evidence for the limited purpose of deciding whether or not the defendant acted with the intent to commit theft in this case."  (See CALCRIM No. 375.)  It was told to consider the degree of similarity between the two offenses in evaluating this evidence.  (*Id*.)  It was told not to consider the evidence for any other purpose, and not to conclude that defendant had a bad character or criminal disposition.  (*Id*.)  Finally, it was told that the evidence was not sufficient by itself to establish the requisite intent.  (*Id*.)

### B.  Section 1101

"Character evidence, sometimes described as evidence of propensity or disposition to engage in a specific conduct, is generally inadmissible to prove a person's conduct on a specified occasion.  (Evid.Code, § 1101, subd. (a).)  Evidence that a person committed a crime, civil wrong, or other act may be admitted, however, not to prove a person's predisposition to commit such an act, but rather to prove some other material fact, such as that person's intent or identity.  (*Id.*, § 1101, subd. (b).)  We review the trial court's decision whether to admit evidence, including evidence of the commission of other crimes, for abuse of discretion.  [Citation.]"  (*People v. Harris* (2013) 57 Cal.4th 804, 841.)

---

[7]  The court granted a defense motion to exclude evidence that defendant had a number of used tools in the van and that when Officer Basuino first contacted him, defendant volunteered the statement, "Is this about the tools?"

Here the evidence of the 2009 burglary was offered on the rationale that it tended to establish the requisite mental element for the charged burglary, i.e., that when defendant entered the Gonzales garage he possessed the intent to steal. (See Pen. Code, § 459 [defining burglary as entry into specified structure or area "with intent to commit grand or petit larceny or any felony"].) Numerous decisions have upheld the admission of prior burglaries on a similar rationale when, as here, a defendant contests the sufficiency of the prosecution evidence to establish the required intent. (See *People v. Harris*, *supra*, 57 Cal.4th 804, 842 [evidence of prior burglary admissible to show larcenous intent where "[i]n both cases, defendant entered a woman's dwelling within walking distance of his own apartment at night, and stole several items"; defendant's commission of earlier burglary "supports the reasonable inference that he also intended to steal from [second victim's] apartment"]; *People v. Delgado* (1992) 10 Cal.App.4th 1837, 1846 [prosecutor was properly allowed to ask questions designed to show prior burglary resembling charged offense in that both involved entry through a window, theft of a VCR in payment of a debt, and asportation of VCR and jewelry in a pillowcase]; *People v. Wilson* (1991) 227 Cal.App.3d 1210, 1216-1217 [where defendant claimed to have entered acquaintance's residence to wait for her, while intoxicated on alcohol and drugs, evidence of earlier burglary conviction involving similar circumstances and excuse was properly admitted as evidence of larcenous intent]; *People v. Nible* (1988) 200 Cal.App.3d 838, 846-850 [where defendant introduced evidence of extreme intoxication at time of entry into victim's bedroom through window, court properly admitted evidence of earlier intrusions through bedroom windows with apparent intent to commit sex offenses]; *People v. Dowdy* (1975) 50 Cal.App.3d 180, 188 [in prosecution for burglaries of jewelry and pet stores, evidence of prior burglary of clothing store was properly admitted to show defendant's larcenous intent; facts were "strikingly similar"]; *People v. Enos* (1973) 34 Cal.App.3d 25, 36-37 [where defendant claimed to be looking for

9

someone when surprised in garage by homeowner, and defendant placed intent in issue at trial by claiming to have been looking for a friend, prosecution was properly allowed to adduce evidence of prior conviction for possessing property stolen from two residential garages, plus incident where defendant was found prowling around residence and professed to be looking for friend]; *People v. Curcio* (1967) 255 Cal.App.2d 183, 185-186 [in prosecution for burglary arising from theft of radios from distributor's warehouse, trial court properly admitted evidence of prior theft from another radio distributor's warehouse using similar technique]; *People v. Romero* (1966) 244 Cal.App.2d 495, 498-500 [evidence of three previous burglaries properly admitted where defendant claimed that he was too intoxicated to form intent necessary for burglary]; *People v. Rosenfield* (1966) 243 Cal.App.2d 60, 68-69 [where defendants testified that they entered victim's apartment solely to recover funds he had stolen from one of them after she performed act of prostitution, trial court properly allowed evidence of previous incident in which that defendant's solicitation of act of prostitution led to armed robbery by other defendant], disapproved on another point in *People v. Carpenter* (1997) 15 Cal.4th 312, 381-382; *People v. Kerns* (1955) 134 Cal.App.2d 110, 114 [where defendant denied larcenous intent and attributed presence in store to inveiglement by mysterious female, trial court properly admitted evidence of prior attempted break-in which defendant also attributed to encounter with mysterious female]; *People v. Bonilla* (1932) 124 Cal.App. 212, 215 [evidence of prior burglary of dry goods store properly admitted to rebut defendant's denial of knowledge that goods he hauled away from service station were stolen].)

Defendant contends that the two incidents here were not sufficiently similar to justify the inference held permissible in cases such as the foregoing. He asserts that the trial court's stated finding of "several" similarities rests on "the parsing of a single factor into multiple parts." The question, however, is not the number of points of similarity but their logical relevance to establish the mental element of the charged offense. The

10

rationale for introducing uncharged misconduct to show intent has been said to be that " 'if a person acts similarly in similar situations, he probably harbors the same intent in each instance' . . . . The inference to be drawn is not that the actor is *disposed* to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him by the prosecution." (*People v. Robbins* (1988) 45 Cal.3d 867, 879 (*Robbins*).) This inference in turn depends on " 'the doctrine of chances—the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all. Without formulating any accurate test, and without attempting by numerous instances to secure absolute certainty of inference, the mind applies this rough and instinctive process of reasoning, namely, that an unusual and abnormal element might perhaps be present in one instance, but that the oftener similar instances occur with similar results, the less likely is the abnormal element likely to be the true explanation of them. [¶] . . . In short, similar results do not usually occur through abnormal causes; and the recurrence of a similar result (here in the shape of an unlawful act) tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act; and the force of each additional instance will vary in each kind of offense according to the probability that the act could be repeated, within a limited time and under given circumstances, with an innocent intent.' " (*Id.* at pp. 879-880, quoting 2 Wigmore, Evidence (Chadbourn rev. 1979) § 302, p. 241; see Imwinkelried, The Use of Evidence of an Accused's Uncharged Misconduct to Prove Mens Rea: The Doctrines Which Threaten to Engulf the Character Evidence Prohibition (1990) 51 Ohio St. L. J. 575, 593 (Uncharged Misconduct).)

11

Professor Imwinkelried, upon whose treatise the Supreme Court relied in *Robbins*, *supra*, 45 Cal.3d at pages 879-880, has suggested that the intermediate inference justifying proof of intent by evidence of uncharged misconduct is "the objective improbability of the accused's innocent involvement in so many similar incidents." (Imwindelrid, *supra,* at p. 594, fn. omitted.) In his view, such an inference is supportable only if three threshold criteria are satisfied: (1) each uncharged incident must be "roughly similar to the charged crime" (*id.* at p. 595, italics omitted); (2) counting both charged and uncharged incidents, the accused must have been "involved in such events more frequently than the typical person" (*id.* at p. 597, italics omitted); and (3) the existence of mens rea "must be in bona fide dispute," such that the prosecution has "a legitimate need to resort to the uncharged misconduct evidence to prove intent" (*id.* at p. 598, italics omitted).

Here we have no difficulty in concluding that all three of these criteria were satisfied. First, the trial court could quite properly find the charged and uncharged offenses materially similar in that both involved defendant's nonconsensual entry into residential garages belonging to complete strangers, the doors of which garages had been left open. Defendant asserts that these similarities were negated by differences between the two incidents: "In the prior case, Mr. Rocha was in a vehicle, he drove by the residence more than once before stopping and entering the garage, and he took stereo components while ignoring the tools that were in the garage. When contacted by the police, he did not evade and was cooperative. In this case, Mr. Rocha was on foot, took tools and appeared to be prepared to take a bicycle, attempted to avoid the police and was uncooperative." None of these distinctions defeats the extraordinary circumstance of having twice entered strangers' garages and carried away property belonging to them. Under Professor Imwinkelried's analytical framework, the events need only be "roughly

12

similar," i.e., similar enough to make it unlikely that each, or any, of them occurred innocently. The two incidents at issue here meet this criterion.

Professor Imwinkelried's second factor—extraordinary frequency—gives us some pause, for we are concerned with only one uncharged incident, making two incidents in total. But the Supreme Court has rejected the proposition that the doctrine of chances cannot justify admission of a single incident of uncharged misconduct, stating, "We agree with the Oregon Supreme Court that 'no categorical statement can be made one way or the other. Depending upon the circumstances of the case, sometimes one prior similar act will be sufficient . . . . A simple, unremarkable single instance of prior conduct probably will not qualify, but a complex act requiring several steps, particularly premeditated, may well qualify. These decisions must be made case-by-case . . . .' " (*Robbins*, *supra*, at pages 880-881, fn. 5, quoting *State v. Johns* (1986) 301 Or. 535 [725 P.2d 312, 324].) Neither of the incidents here may have been a particularly "complex act," but both were sufficiently remarkable to trigger an inference that neither could have been innocent. Moreover, they occurred within two years of each other, and even one such entry is more than a "typical person" would be likely to make in a lifetime. And while the circumstances of the second, charged entry do not affirmatively suggest "premeditation," the circumstances of the first entry—defendant's apparent reconnoitering of the neighborhood—do indeed raise such an inference.

As for Professor Imwinkelried's third factor—a bona fide dispute as to the mental element of the charged offense—defendant certainly put that issue into controversy. His entire defense was that the prosecution had failed to prove beyond a reasonable doubt that he entered the Gonzales garage with larcenous intent. Defense counsel argued to the jury that defendant "could have been a homeless drug user, looking for a place for shelter, respite or suffering from delusions or paranoia [induced by methamphetamine use] . . . . It is quite possible that Mr. Rocha . . . as a drug user, . . . saw an open garage and looked

13

for a place for shelter." Later he said, "Mr. Rocha may have been high, compromised, confused, hearing voices, delusional, not knowing where he was or where he was or who he was when he entered that garage." Consistent with this theory, the jury was instructed that it could consider the effects of voluntary intoxication in determining whether the prosecution had satisfied its "burden of proving beyond a reasonable doubt that the defendant acted with the intent to commit theft."

We detect no error in the trial court's ruling that the prior burglary was admissible under Evidence Code section 1101, subdivision (b).

### C. Section 352

Even when evidence of uncharged conduct is otherwise admissible, it must be excluded if its probative value is outweighed by its potential to prejudice the factfinder against a party, to confuse the issues, or to consume undue amounts of time. (Evid. Code, § 352; *People v. Mungia* (2008) 44 Cal.4th 1101, 1130.) The trial court's decision to admit evidence over an objection on this ground is reviewed for abuse of discretion. (See *People v. Harris*, *supra*, 57 Cal.4th at p. 842.)

In a flight of hyperbole, defendant characterizes the evidence here as "highly inflammatory." Evidence may be fairly so characterized only when it might be expected to outrage the jurors' sensibilities, i.e., to so "inflame" their sentiments as to render them incapable of objectively evaluating the evidence before them. The evidence here could hardly have that effect. It was about as innocuous as evidence of uncharged crimes can ever be. No one was injured or even threatened with injury in either case. In both instances, defendant simply strolled into an open garage, took some property, and left. The nearest suggestion to any kind of threat or menace was the alarm Bianka Gonzales must have felt when she opened the door into the garage and saw a complete stranger rummaging through her father's tools. This is hardly the stuff of which inflamed sentiments are made.

14

Nor does defendant identify anything particularly prejudicial about the evidence here. He therefore falls back on the threat of prejudice inherent in all evidence of uncharged misconduct. He cites a recent decision by this court in which we acknowledged that in view of this inherent risk, such evidence may be admitted " 'only if [it has] *substantial* probative value.' " (*People v. Lopez* (2011) 198 Cal.App.4th 698, 715, quoting *People v. Foster* (2010) 50 Cal.4th 1301, 1331.) But as we also noted there, a substantial part of the risk said to be inherent in such evidence is that it "breeds a 'tendency to condemn, not because [the defendant] is believed guilty of the present charge, but because he has escaped unpunished from other offences [*sic*] . . . .' " (*Ibid.*) The court obviated this risk here when it informed the jury, by stipulation, that defendant had been charged with burglary as a result of the 2009 incident "and was convicted of the same on June 29th, 2010, after defendant plead [*sic*] no contest to the charge."

At the same time, the court could quite reasonably conclude, as it manifestly did, that the evidence possessed substantial probative value in responding to the defense theory, which depended on raising a substantial possibility that defendant had entered the garage in a bewildered state and had decided to steal something, if at all, only after finding himself there. In an attempt to lend substance to these possibilities, the defense elicited testimony from a county criminalist that a "chronic user of methamphetamine, over time . . . can have paranoia and delusion." An example of such paranoia might be where a person talking to a methamphetamine user puts a hand in a pocket and the user, thinking a knife or gun is being drawn, strikes the person. The user may thus "misunderstand, misinterpret or over-react to things around them." A delusion, in turn, is "a strong feeling about, something that is not really true or despite of the evidence that what he believes is not true." (So transcribed.) An example would be an insistence that the earth is flat, "something totally off the wall type of belief because of what is going on in the brain." A methamphetamine user's thoughts may be "confused and disorganized."

15

Counsel also cited the testimony of Bianka Gonzales that defendant struck her as disoriented and that she thought he was on drugs.

Based on this evidence, defense counsel asked the jury to entertain the possibility that defendant had wandered into the Gonzales garage in a state of drug-induced befuddlement, perhaps "looking for a place for shelter, respite or suffering from delusions or paranoia." The evidence that he had, on another occasion, entered a garage with a preexisting intent to steal tended strongly, through the doctrine of chances, to controvert this hypothesis. A drug-addled wanderer might stray into a stranger's garage for a first time; but if he has previously entered such a garage for purposes of theft, and has been apprehended and punished for such conduct, he is hardly likely to do it again with innocent intent, however bewildered he may be. In a sense the defense theory may be characterized as one of mistake, i.e., defendant entered the garage without understanding what he was doing, and thus without the intent to steal, or any other objectively coherent intent. The fact that he had previously engaged in identical conduct with larcenous intent did not *conclusively* refute this hypothesis; but that was not required. All that was required was that the fact of the prior burglary have a substantial tendency in reason to establish that defendant entered the garage with knowledge of what he was doing and with intent to do the only objectively advantageous thing he could do there: steal something valuable, as he had done before in another garage That at any rate was an inference the jury could reasonably draw, and one for which the prosecution was entitled to lay the evidentiary foundation. Its probative value arose from the very theory proffered by the defense.

Defendant suggests that the prejudicial potential of the evidence was unnecessarily heightened by the manner of its presentation, i.e., the prosecutor was permitted to "virtually retry" the earlier case by presenting three witnesses to that incident. No alternative method of proving the relevant facts has been suggested here or below. Nor

16

does defendant otherwise elaborate upon this suggestion. We therefore pass it without further consideration.

Defendant complains of the fact that evidence concerning the 2009 burglary "was not presented in a discrete portion of the prosecution's case, but . . . piecemeal[,] with testimony concerning other events occurring between witnesses describing the prior burglary." No attempt is made to build a syllogistic argument on this fact, but defendant goes on to note the trial court's obligation to "consider not only the lack of particular probative value but also facts showing that the use of the evidence could confuse the jury and overly complicate the issues at trial." He acknowledges the court's express finding that these factors did not warrant exclusion of the evidence, but he implies that the court should have explained that finding in more detail. The court was under no obligation to do so. In any event, having reviewed the whole record with some care, we see no significant risk that the evidence as presented confused the jury, or otherwise diverted it from the proper discharge of its duties.

Defendant alludes to testimony by the officer who arrested him for the 2009 burglary that defendant made a comment at that time reflecting his familiarity with the fact that used tools could be profitably sold. This is not charged as a separate error but apparently offered to substantiate defendant's claims of undue prejudice. We fail to see how it can have that effect. The trial court carefully limited the testimony so as to convey nothing more than defendant's familiarity with the possibility of profitably selling used tools. This was obviously relevant to motive, which in turn supported an inference of intent. We again decline to discuss in depth an argument defendant has not troubled to articulate.

We find no error under state law in the court's admission of the evidence of the 2009 burglary.

### D. *Due Process*

Finally, defendant contends that admission of the evidence of the 2009 burglary violated his right to due process.  In the one federal case he cites where such a conclusion was reached, the court found that the evidence of uncharged misconduct had served *no* legitimate purpose and thus operated only to invite an "impermissible propensity inference."  (*McKinney v. Rees* (1993) 993 F.2d 1378, 1383.)[8]  Here, as we have noted, the evidence was relevant to support a legitimate incriminating inference independent of any consideration of propensity.  The cited case therefore provides no ground for reversal.

Defendant also cites *People v. Partida* (2005) 37 Cal.4th 428, 435, for the proposition that "a trial court's improper application of Evidence Code section 352 may also rise to the level of a due process violation."  What the court actually held there was that after a defendant's Evidence Code section 352 objection had been overruled, he could—despite failing to mention the due process clause in the trial court as a separate ground of objection—"make a very narrow due process argument on appeal," i.e., "that the asserted error in admitting the evidence over his Evidence Code section 352 objection had the additional legal consequence of violating due process."  (*Ibid*.)  The holding of

---

   [8]  Defendant also cites *Michelson v. United States* (1948) 335 U.S. 469, 475-476, for the proposition that "[w]hen no permissible inference may be drawn from the misconduct evidence, the error transcends mere evidentiary error and violates the constitutional proscription against trial by character assassination."  We reject this interpretation of the cited decision, in which Justice Jackson declared much of the thicket of common-law rules then governing the introduction of character evidence to be "archaic, paradoxical and full of compromises and compensations by which an irrational advantage to one side is offset by a poorly reasoned counter-privilege to the other."  (*Id.* at p. 486.)  The court nonetheless declined to modify this "grotesque structure" by "pull[ing] one misshapen stone out of" it.  (*Ibid*.)  The court therefore affirmed a conviction in which the prosecution had been allowed to ask character witnesses, called by the defendant, whether they knew about a prior conviction that the Court of Appeals found too remote and dissimilar to have any rational bearing on the case.

that case cannot come into play unless the Evidence Code section 352 objection was overruled in error. Here we have concluded that the court did not err by overruling the objection. Therefore no due process claim can be predicated on the holding of *Partida*.

Defendant's final argument is that the asserted error in admitting this evidence was prejudicial. It is of course unnecessary to reach this question in view of our determination that no error occurred. We do wish to acknowledge, however, defendant's concern that the jury "struggled with the issue of intent," thus indicating the critical role of that question in its verdict. It would hardly be surprising if the jury focused on this issue, since it was essentially the only ground of defense. But the evidence cited by defendant indicates that insofar as the jury "struggled" with this issue, it was dealing with the legal parameters of burglarious intent and not their application to the evidence presented. Thus the jury foreperson did submit an inquiry to the court expressing "confus[ion] about 'intent to commit burglary.' "[9] But the note referred to an instruction which, as originally given, invited confusion on this subject by enumerating the elements of theft as if they were elements of burglary—which of course they could not be, since burglary does not require a completed theft but only an entry with intent to steal.[10] In

---

[9] The note read, "We are confused about 'intent to commit burglary.' According to Penal Code 459 [which was referenced in the relevant instruction], items 1 through 4 must be satisfied to convict. In addition the 1st sentence after items 1-4 says, 'A burglary was committed if the defendant entered with the intent to commit theft.' Is this last sentence a fifth condition of burglary? Both the prosecutor and the defendant's attorney said that burglary is committed when the defendant intends to steal as he crosses threshold. Please clarify."

[10] The written instruction, CALCRIM No. 1700, was available to the jury during deliberations. It stated:

"The defendant is charged in Count 1 with burglary in violation of Penal Code section 459.

"To prove that the defendant is guilty of this crime, the People must prove that:

19

response to the jurors' question, the court furnished them with a new instruction, directing them to substitute it for the original instruction and to "[d]isregard the old instruction . . . in its entirety." The new instruction clarified that the elements of theft were relevant only to determining whether defendant "intended to commit theft," and not as elements of the offense in their own right.

---

"1. The defendant entered a building;

"AND

"2. When he entered a building, he intended to commit theft.

"To decide whether the defendant intended to commit theft, the People must prove that:

"1. The defendant took possession of property owned by someone else;

"2. The defendant took the property without the owner's or owner's agent's consent;

"3. When the defendant took the property he intended to deprive the owner of it permanently or to remove it from the owner's or owner's agent's possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property;

"AND

"4. The defendant moved the property, even a small distance, and kept it for any period of time, however brief.

"A burglary was committed if the defendant entered with the intent to commit theft. The defendant does not need to have actually committed theft as long as he entered with the intent to do so. The People do not have to prove that the defendant actually committed theft.

"Under the law of burglary, a person enters a building if some part of his or her body or some object under his or her control penetrates the area inside the building's outer boundary."

20

The record provides no basis to suppose that the jurors' "confusion" about the intent element had any bearing at all on its evaluation of the defense theory. So far as the record shows, the jury sought clarification only because the original instruction conflated the element of intent, which was necessary to convict, with the elements of a completed theft, which was not.

## II. Presentence Custody Credits

Defendant contends that the trial court shortchanged him on credit for presentence confinement by denying credit for the entire period he was also subject to a parole hold. Defendant contends that 41 days of this time were solely attributable to the conduct underlying the present charges, and therefore seeks additional credit of 41 actual days and 6 days conduct, for a total of 47 days. Respondent concedes the point. We accept the concession. The crucial premise, which respondent concedes, is that under the governing guidelines, "only 9 months of the 12-month parole term could have been based on the absconding charge," such that "3 months of the term must have been solely attributable to the burglary offense." Since defendant was released from the parole term after serving 166 days, a proportionate fraction of that time—one-quarter, or 41 days—must be attributed solely to the burglary charge. We will direct a modification of the judgment accordingly.

### DISPOSITION

The trial court is directed to modify the abstract of judgment to reflect an additional 41 days credit for actual time in presentence confinement, plus 6 days conduct credit. In all other respects the judgment is affirmed.

21

_____

RUSHING, P.J.

WE CONCUR:

_____

PREMO, J.

_____

ELIA, J.

*People v. Rocha*
**H038703**

22

Trial Court:                                                 Santa Clara County
Superior Court No.: C1103705

Trial Judge:                                           The Honorable Teresa Guerrero-Daley

Attorney for Defendant and Appellant
Manuel Alfred Rocha:                        David S. Adams
under appointment by the Court
of Appeal for Appellant

Attorneys for Plaintiff and Respondent
The People:                                          Kamala D. Harris
Attorney General

Dane R. Gillette,
Chief Assistant Attorney General

Gerald A. Engler,
Senior Assistant Attorney General

Seth K. Schalit,
Supervising Deputy Attorney General

Leif M. Dautch,
Deputy Attorney General

*People v. Rocha*
**H038703**