Filed 11/22/23  Conservatorship of M.C. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| Conservatorship of the Person of M.C. | B327027 |
| | Los Angeles County |
| LOS ANGELES COUNTY OFFICE OF THE PUBLIC GUARDIAN, as Conservator, etc., | Super. Ct. No. ZE042938 |
| Petitioner and Respondent, | |
| v. | |
| M.C., | |
| Objector and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Ronald Owen Kaye, Judge.  Affirmed.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey,

Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

M.C. was charged with murder and declared incompetent to stand trial. The Los Angeles County Office of the Public Guardian (the Public Guardian) petitioned for appointment as a Murphy conservator. At trial on the petition, the Public Guardian presented evidence that M.C. suffers from delusions, some of which involve violence against others. The jury found M.C. presents a substantial danger to others by reason of a mental disorder, and the court imposed a Murphy conservatorship. On appeal, M.C. argues the jury's verdict is not supported by substantial evidence, the court erroneously admitted his testimony from a prior trial, and the court should have declared a mistrial. We reject M.C.'s arguments and affirm.

## FACTS AND PROCEDURAL BACKGROUND

### 1.   *The murder charges*

In December 2016, M.C. allegedly killed a man by repeatedly stabbing him in the chest with a pair of scissors. M.C. was 65 years old at the time. The People charged M.C. with murder, but a court found he was incompetent to stand trial. M.C. was admitted to Patton State Hospital (Patton), and a court issued an order for involuntary medication.

### 2.   *The Murphy conservatorship*

In August 2018, the Public Guardian filed a petition for appointment as a Murphy conservator. A Murphy conservatorship is a type of civil commitment for gravely disabled individuals who are incompetent to stand trial on charges involving death or great bodily harm. (Welf. & Inst. Code, § 5361, subd. (a); see *Conservatorship of A.A.* (2022)

2

84 Cal.App.5th 66, 68.)[1]  After a bench trial, the court found M.C. met the criteria for a Murphy conservatorship and appointed the Public Guardian as his conservator for a one-year term.

About a month before the end of the conservatorship, the Public Guardian filed a petition for re-appointment.  At M.C.'s request, the case was tried to a jury in December 2021.  M.C. testified on his own behalf.  The jury found M.C. qualified for a Murphy conservatorship, and the court reappointed the Public Guardian as his conservator.

### 3.    *The present trial*

The Public Guardian filed another request for reappointment, and the case was tried to a jury in 2022.  At the trial, the parties stipulated that M.C. had a pending charge for violating Penal Code section 187, subdivision (a), a court found probable cause for the charge, and M.C. was found mentally incompetent to stand trial in that case.  The only issue for the jury to decide was whether M.C. represents a substantial danger of physical harm to others by reason of a mental disease, defect, or disorder.

#### a.    *M.C.'s prior testimony*

Over M.C.'s objection, the court allowed the Public Guardian to introduce into evidence portions of M.C.'s testimony from the December 2021 jury trial.  The testimony included M.C.'s account of the incident that led to the murder charge.

M.C. testified he was sleeping under a bridge when the victim struck him in the head five times with "steel nunchuks." The victim said he would be back to kill M.C. because he " 'hate[s] Mexicans.' "  M.C. grabbed a pair of sewing scissors to protect

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

himself.  The victim tried to punch M.C., but M.C. blocked the punch and stabbed the victim.

According to M.C., at that point, an "eight-foot tall tornado came in like Star Trek in the T.V."  From the "whirlwind," a man named Hector stepped out of colored vapors and accused the victim of stealing his money.  Hector took out a knife and stabbed the victim 12 or 13 times, but it did not kill him.  M.C. said the victim "was in perfect health," not injured at all, and now runs a liquor store in Atwater Village.

M.C. testified that he had been hospitalized four times in the past.  He also claimed he had been wrongly convicted of assault with a deadly weapon for breaking a man's hand with a tree branch.  M.C. seemed to believe the People accused him of harming the victim using a photograph of the tree branch, rather than the branch itself.

b.    *M.C.'s treating psychiatrist*

The Public Guardian presented testimony from M.C.'s treating psychiatrist at Patton, Jasdeep Aulakh.  According to Aulakh, M.C. had been diagnosed with schizoaffective disorder, bipolar type.  His symptoms include disorganized thought processes, manic episodes, "odd, bizarre, kind of grandiose delusions, and persecutory thoughts."  Among other delusions, M.C. claimed to be a multi-star general in the military, a law professor, and the owner of a baseball team.

Aulakh prescribed M.C. an atypical anti-psychotic medication at twice the maximum dosage that would be administered in an outpatient setting.  Despite the medication, M.C. continued to suffer delusions and his mental health had not improved.

Aulakh testified that M.C. initially refused to allow staff to draw his blood to monitor his health and confirm he was taking his medication.  After the hospital obtained a court order

4

allowing staff to do so, M.C. agreed to give one vial of blood at a time, which was significantly less than Aulakh needed. Nevertheless, Aulakh did not press the issue because he did not want a confrontation with M.C., which he feared could place hospital staff in danger.

Aulakh reported that M.C. had recently fallen after a chair he was sitting in collapsed. For a "brief period of time" after the fall, M.C. used a walker and wheelchair. Since then, he had been walking "really well with a stable gait." Aulakh described M.C. as "quite able-bodied" and considered him a physical threat. Nevertheless, Patton staff designated M.C. a "fall risk" and placed him in the hospital's "frail unit."

According to Aulakh, M.C. had not had any physical altercations with other patients or staff at Patton. Aulakh explained that, because M.C. is physically imposing, the staff tried to avoid confrontations with him. Also, the staff who cared for him were trained to minimize the risks of confrontations with patients.

Aulakh opined it is "[h]ighly unlikely" that M.C. would comply with a medicine regiment outside the structured environment of Patton. He explained that M.C. claims he does not suffer from schizoaffective disorder and believes he does not need medication.

c.      *The Public Guardian's expert*

In addition to M.C.'s treating physician, the Public Guardian presented expert testimony from a psychiatrist, Gordon Plotkin. Plotkin interviewed M.C. five times and performed a psychiatric evaluation of him. Plotkin agreed with M.C.'s treating physician that M.C. suffers from schizoaffective disorder, bipolar type.

Plotkin testified that M.C.'s symptoms include hallucinations, delusions, disorganized thinking, and

disorganized speech. Among other delusions, M.C. claimed he is the highest-ranking official in the military, a prosecutor in Monte Carlo, and a supreme court justice. He said he has authority to have people executed and the governor might ask him to murder someone. M.C. believed he would be shielded legally because of his military work.

Plotkin explained that schizoaffective disorder is a lifelong condition that cannot be cured, but it can be managed with anti-psychotic and mood stabilizing medications. The keys to managing M.C.'s condition are medication compliance and insight into mental illness. M.C. had no insight whatsoever into his symptoms and illness, despite having been hospitalized many times. M.C. told Plotkin he would stop taking his medication if given the choice because he would be better off without it.

Plotkin opined that M.C. presents a substantial danger of physical harm to others due to his mental illness. In support, he pointed to the fact that M.C. experiences delusions that drive him to commit violent acts.

Plotkin acknowledged that M.C. had not had any recent violent incidents, had been compliant with his medication, and was considered a "fall risk." Plotkin explained those facts did not change his opinion concerning M.C.'s dangerousness because they were "environment dependent." Plotkin noted that, since 2019, M.C. had been living in a high-security facility where he was closely supervised by forensically trained staff. He also noted that M.C. was considered a fall risk during a time he was "over-medicated."

4.    *Verdict and appeal*

After deliberating for less than an hour, the jury found M.C. represents a substantial danger of physical harm to others by reason of a mental disease, defect, or disorder. It also found

M.C. qualifies for a Murphy conservatorship. M.C. timely appealed.

## DISCUSSION

### 1. *Relevant law and standard of review*

"The Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq. . . .) authorizes the creation of renewable one-year conservatorships for persons who are gravely disabled as a result of a mental disorder." (*People v. Quiroz* (2016) 244 Cal.App.4th 1371, 1375–1376*.*) As relevant to this case, a person is "gravely disabled" if (1) the person has a pending felony case involving death or great bodily harm to another; (2) there has been a finding of probable cause at a preliminary examination; (3) as a result of a mental-health disorder, the person is unable to understand the nature and purpose of the proceedings against him and to assist counsel in his defense; and (4) the person represents a substantial danger of physical harm to others by reason of a mental disease, defect, or disorder. (§ 5008, subd. (h)(1)(B)(i)–(iv).) A conservatorship imposed under this definition of " 'gravely disabled' " is commonly referred to as a " ' "Murphy conservatorship." ' " (*Quiroz,* at p. 1376.)

A Murphy conservatorship automatically terminates after one year. (§ 5361, subd. (a).) If the conservator determines the conservatorship is still required beyond that period, the conservator may petition the superior court for reappointment for an additional one-year period. (*Id.*, subd. (b).)

A court may impose a Murphy conservatorship over a person only if the petitioner proves, beyond a reasonable doubt, the person is gravely disabled. (*Conservatorship of Murphy* (1982) 134 Cal.App.3d 15, 17–18 (*Murphy*).)

### 2. *Substantial evidence supports the jury's verdict*

M.C. challenges the sufficiency of the evidence supporting the jury's verdict.

7

We review a jury's verdict in a Murphy conservatorship case for substantial evidence. (*Murphy*, *supra*, 134 Cal.App.3d at p. 18.) Under this familiar standard, we review the entire record in the light most favorable to the verdict to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find all the elements of a Murphy conservatorship beyond a reasonable doubt. (See *People v. Clements* (2022) 75 Cal.App.5th 276, 298.) In so doing, we presume in support of the verdict the existence of every fact the trier could reasonably deduce from the evidence. (*People v. Nieber* (2022) 82 Cal.App.5th 458, 476; *People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.) Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. (*People v. Brooks* (2017) 3 Cal.5th 1, 57; *Nieber*, at p. 476.)

We resolve all evidentiary conflicts and questions of credibility in favor of the verdict. (*People v. Brady* (2018) 22 Cal.App.5th 1008, 1014, quoting *People v. Cardenas* (2015) 239 Cal.App.4th 220, 226–227.) We cannot reweigh the evidence or reassess witness credibility on our own. (*People v. Young* (2005) 34 Cal.4th 1149, 1181 [resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact].)

Here, the parties stipulated to three of the four elements required for a Murphy conservatorship: (1) M.C. had a pending murder case; (2) there had been a finding of probable cause at a preliminary hearing in that case; and (3) M.C. was incompetent to stand trial as a result of a mental-health disorder. Therefore, the only issue on appeal is whether substantial evidence supports the jury's finding on the fourth element: that M.C. represented a substantial danger of physical harm to others by reason of a

8

mental disorder.  (§ 5008, subd. (h)(1)(B)(iv).)  We conclude it does.

The record contains ample evidence that M.C. has a severe mental disorder.  M.C.'s treating psychiatrist testified that he suffers from schizoaffective disorder, bipolar type, which causes him to experience frequent delusions, some of which are violent in nature.  For example, M.C. claimed he is the highest-ranking officer in the military with the authority to have people executed.  He also claimed the governor might ask him to commit homicide, for which he would have legal immunity because of his position in the military.

The record also contains evidence that M.C.'s mental disorder has led him to commit actual violence.  The jury heard M.C.'s testimony from the 2021 trial, in which he admitted stabbing a man with a pair of scissors.  Although portions of M.C.'s testimony seemed plausible, he also recounted facts that were plainly delusions.  For example, he claimed the victim was armed with "steel nunchuks," an "eight-foot tall tornado came in like Star Trek," and a man named Hector appeared in the "whirlwind."  M.C. also was adamant that, despite being stabbed more than a dozen times, the victim suffered no visible injuries and was in "perfect health."  Given these incredible claims, the jury reasonably could have found M.C.'s decision to stab the victim was connected to his mental disorder.

The jury also reasonably could have concluded there is a substantial danger M.C. will commit similar acts of violence in the future.  The Public Guardian's expert testified that schizoaffective disorder is a lifelong condition that cannot be cured.  Consistent with that characterization, M.C.'s psychiatrist reported his condition had not improved and he continued to experience delusions, despite being heavily medicated and receiving intensive treatment.  Moreover, according to the expert,

the keys to managing M.C.'s disorder are medication compliance and insight into the disorder. The record indicates M.C. lacked both, as he repeatedly denied being mentally ill and claimed he would stop taking his medication if given the option. On this record, the jury reasonably could have found M.C. poses a substantial danger of physical harm to others on account of a mental disorder.

M.C. contends the jury's finding was unreasonable in light of evidence that he is elderly and physically infirm. He points out he was 71 years old at the time of trial, the hospital staff considered him to be a "fall risk," he resided in the hospital's "frail unit," and he had been reliant on a walker and wheelchair.

Contrary to M.C.'s contentions, none of this evidence precludes a finding that he was dangerous at the time of trial. Although M.C. was 71 years old, he also was relatively elderly— 65 years old—when he reportedly stabbed a man with scissors. The record also indicates M.C.'s physical infirmities were transitory. The Public Guardian's expert suggested M.C. was considered a fall risk due to the side effects from being over-medicated. Given M.C. claimed he wanted to stop taking his medication, the jury reasonably could have found those side effects would not limit him in the future.

Similarly, M.C.'s reliance on a wheelchair and walker seems to have been intermittent, and it does not appear he used either during trial. In fact, M.C.'s treating physician described him as "quite able-bodied," such that the physician felt threatened by him. The jurors were able to observe M.C. throughout the trial, so they could have evaluated the reasonableness of the physician's fear. The jurors were in a better position than we are to evaluate M.C.'s physical condition at the time of trial, and we decline to second guess them on appeal.

### 3. *The court did not err by admitting M.C.'s prior testimony*

Before trial, M.C. moved to preclude the prosecutor from entering into evidence his testimony from the 2021 trial. M.C. argued admission of the testimony violated his right to due process because it could be used against him in a future criminal proceeding. He also argued the testimony was inadmissible hearsay, he was incompetent at the time he gave it, the testimony lacked reliability, and he did not understand the nature of the oath he was under. Alternatively, he sought to exclude the testimony under Evidence Code section 352, arguing its prejudicial nature far outweighed its probative value.

The court overruled M.C.'s objections and admitted the testimony as party admissions. The court found the testimony was "profoundly probative" on key issues in the case: whether M.C. suffers from a mental disorder and whether he is dangerous. The court noted that whether M.C. understood the nature of the oath went to the weight of the evidence, not its admissibility.

M.C. argues the trial court erred, raising many of the same issues on appeal. First, he contends his prior testimony was inadmissible because there is no indication he was competent to testify or understood the nature of the oath he was given. We are not persuaded.

At the outset, M.C.'s arguments concern the admissibility of the testimony at the 2021 trial, and the proper time to raise them was at that trial. Instead, M.C. effectively waived the issues by voluntarily testifying on his own behalf. At the 2022 trial, the Public Guardian sought to admit the prior testimony as party admissions, which do not require the declarant be competent nor under oath. (See Evid. Code, § 1220.) Therefore, whether M.C. was competent to testify or understood the nature

11

of the oath in 2021 is irrelevant to the admissibility of the statements in 2022.

Even if M.C.'s competency in 2021 were relevant in 2022, he has not shown his prior testimony was inadmissible on that basis. M.C. seems to believe the fact he was incompetent to stand trial means he was incompetent to testify. However, the competency requirements to stand trial and the requirements to testify are distinct. A defendant is incompetent to stand trial if, "as a result of a mental health disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (Pen. Code, § 1367, subd. (a).) In contrast, a witness is incompetent to testify if he or she is "(1) Incapable of expressing himself or herself concerning the matter so as to be understood . . . ; or (2) Incapable of understanding the duty of a witness to tell the truth." (Evid. Code, § 701, subd. (a).)

Here, despite being incompetent to stand trial, M.C. plainly was capable of expressing himself at the 2021 trial. Moreover, although his testimony was bizarre and improbable, it appears he believed he was testifying truthfully. M.C. points to nothing in the record indicating his delusional thinking rendered him incapable of understanding his obligation to tell the truth. Accordingly, he has not met his burden to show he was incompetent to testify. (See *People v. Avila* (2006) 38 Cal.4th 491, 589 [the party challenging a witness has the burden to prove incompetence].)

M.C. briefly argues his prior testimony should be treated like statements made to experts during an examination to determine competency, which are not admissible in a subsequent trial on guilt or sanity. (See Cal. Rules of Court, rule 4.130(d)(3).) We disagree. Our Supreme Court has explained the immunity

rule for statements made during competency examinations is necessary because it protects the accused's privilege against self-incrimination and promotes accuracy in psychiatric evaluations, which furthers the public policy of not criminally trying persons who are mentally incompetent. (*People v. Weaver (*2001) 26 Cal.4th 876, 960.) Those concerns are not present here: M.C. voluntarily testified on his own behalf at the 2021 trial, he did not give the testimony as part of a psychiatric evaluation, and the 2022 trial was a civil proceeding, not a criminal one. We decline to extend the immunity rule to these circumstances.

Next, M.C. argues his prior testimony was "fundamentally unreliable" because it expressed delusional thinking. Relatedly, he argues the Public Guardian improperly used the testimony both to prove the truth of the matters asserted—that he stabbed a man—and also that he suffers from delusions. We agree with the trial court that these issues go to the weight of the testimony, not its admissibility. Moreover, there is nothing improper about the Public Guardian using the testimony for multiple purposes. (See, e.g., *People v. Clark* (2016) 63 Cal.4th 522, 593 [rejecting a defendant's argument that a trial court erred by admitting evidence for both hearsay and nonhearsay purposes].) The jury was capable of analyzing M.C.'s statements to determine which were true and which reflected delusional thinking.

M.C. alternatively argues the court should have excluded the testimony under Evidence Code section 352 because its probative value was substantially outweighed by the probability of undue prejudice. We review a trial court's decision to admit evidence over an Evidence Code section 352 objection for abuse of discretion. (*People v. Rocha* (2013) 221 Cal.App.4th 1385, 1397.)

Contrary to M.C.'s suggestions, his prior testimony had substantial probative value. The Public Guardian's expert

testified that M.C. suffers from schizoaffective disorder, which is a condition that causes delusional thinking.  The expert explained that, although rare, some people experience delusions that lead them to commit acts of violence.  M.C.'s prior testimony—in which he recounted stabbing a man with scissors under bizarre and improbable circumstances—indicates he suffers from such delusions.  Accordingly, it is highly relevant to key issues before the jury:  whether M.C. suffers from a mental disorder that makes him dangerous to others.

M.C. contends the incident was too remote in time to be relevant on the issue of his current dangerousness.  We disagree.  The Public Guardian's expert testified that schizoaffective disorder is a lifelong condition that can be managed, but not cured.  There is ample evidence that, in the years following the stabbing incident, M.C. had not been able to manage the disorder effectively.  Indeed, despite receiving extensive care and medication, he continued to experience delusions, some of which involved violence towards others.  Under these circumstances, evidence that M.C.'s delusional thinking was connected to extreme violence in the relatively recent past is highly probative of whether he is likely to commit similar acts of violence in the present and future.

We also reject M.C.'s suggestion that the evidence was unduly prejudicial.  Even without M.C.'s testimony, the jury would have learned he had been charged with murder and suffers from delusional thinking.  Although bizarre, M.C.'s account of the incident was not particularly graphic.  Nor did he reveal any information that might have turned the jury against him.  Weighed against the evidence's significant probative value on key issues, the court did not abuse its discretion by declining to exclude the testimony under Evidence Code section 352.

14

**4.** ***The court did not err by denying M.C.'s requests for a mistrial***

M.C. argues the trial court erred by refusing to declare a mistrial in response to improper testimony and argument. He identifies three instances in which the trial was "infected" by references to extraneous and prejudicial matters. We consider each in turn.

a. *Standard of review*

" 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]' [Citation.] A motion for a mistrial should be granted when ' " 'a [defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' " (*People v. Collins* (2010) 49 Cal.4th 175, 198–199.)

Generally, we review the denial of a mistrial motion for an abuse of discretion. (*People v. Garcia* (2022) 83 Cal.App.5th 240, 248.) However, we apply a de novo standard where the appellant's constitutional rights are implicated. (*Ibid.*)

b. *Aulakh's testimony*

At trial, M.C. requested the court instruct the jury not to consider the possibility that he could be released into the community. In support, M.C. cited *People v. Mendez* (2018) 21 Cal.App.5th 654 (*Mendez*). The court declined to give M.C.'s proposed instruction, but it agreed the jury could not consider his possible placement.

During direct examination, the Public Guardian asked Aulakh—M.C.'s treating psychiatrist—what must happen before M.C. can transition to a lower level of care. Aulakh responded that M.C. would need to show insight into his disorder, seek

15

treatment on his own, and work collaboratively with his treatment team. The doctor continued: "[M.C.'s] on a very structured specialized unit and he's on a decent dose of medication, and I can just imagine if he was in the community or . . . ." M.C. objected. The court sustained the objection and struck the testimony.

During a break in the trial, M.C. moved for a mistrial, citing *Mendez, supra*, 21 Cal.App.5th 654. M.C. argued that, although the court struck Aulakh's statement, the jury still heard the improper testimony. The court denied M.C.'s motion. On appeal, M.C. argues the court erred because it was impossible to cure the prejudice from Aulakh's testimony.

M.C.'s reliance on *Mendez, supra*, 21 Cal.App.5th 654, is misplaced. In that case, the People sought to commit the appellant as a mentally disordered offender (MDO). (*Id.* at p. 656.) Like a Murphy conservatorship, an MDO commitment requires a finding that the person represents a substantial danger to others. At the People's request, the trial court in that case instructed the jury it must determine whether the appellant represented a substantial danger " '*if released into the community unsupervised.*' " (*Id.* at p. 659.) The Court of Appeal held the trial court erred and reversed the commitment order. The court explained the qualification in the instruction—if released into the community unsupervised—was not consistent with the statute, improperly asked the jury to consider the consequences of its verdict, and was misleading because there were alternatives to unsupervised release. (*Id.* at pp. 660–661, 663.)

We will assume, for the sake of argument, the *Mendez* court's reasoning also applies to Murphy conservatorships. Nevertheless, the case is inapposite. Here, unlike in *Mendez*, the trial court did not give a flawed instruction. Nor did it suggest to the jury it should consider M.C.'s future placement

16

or the consequences of its verdict. To the contrary, when M.C.'s psychiatrist started to discuss the possibility that M.C. could be released into the community, the court immediately sustained M.C.'s objection and struck the testimony. In fact, the court sustained the objection before the doctor had finished his thought, which plainly communicated to the jury it should not consider the issue. The court's swift and definitive action cured any potential prejudice. Accordingly, under any standard of review, the court did not err in denying M.C.'s motion for a mistrial.

      c.    *Plotkin's testimony*

On direct examination, the Public Guardian's expert, Gordon Plotkin, testified that M.C. poses a substantial physical danger to others due to his mental disorder. The Public Guardian asked Plotkin to elaborate on his opinion. Plotkin noted there were "two officers next to him in [the] court. So the chance of him—." M.C. objected, and the trial court struck the testimony.

The court and the parties discussed the incident during a break in the trial. The prosecutor suggested Plotkin was simply explaining why he believed M.C. is dangerous, despite the lack of recent violent incidents. M.C. moved for a mistrial, arguing Plotkin's comment shifted the burden to show dangerousness.

The court noted the testimony was improper, but it found Plotkin's comment did not warrant a mistrial. The court offered to give a curative admonition, which M.C. accepted. The court then admonished the jury as follows: "[B]efore we took our break, you heard some testimony regarding the fact that there are two guards that are here with [M.C.], and then I granted a motion to strike, and that was stricken. [¶] But I just wanted to advise you that it is standard practice that individuals transported from Patton State Hospital to this court are escorted by two guards,

and you should not consider for the purpose of determining whether [M.C.] is a danger to others that he is escorted by two guards to this courtroom."

Contrary to M.C.'s contentions, the trial court handled the situation appropriately and cured any potential prejudice. Regardless of Plotkin's comment, the jury likely would have noticed that M.C. had been escorted by guards throughout the trial. Although Plotkin's comment drew additional attention to the situation, the court explained to the jury it was common practice and had no bearing on M.C.'s potential dangerousness. The court's admonition sufficiently cured any prejudice. In fact, it is likely M.C. benefited from the incident, as the jury was no longer left to speculate as to the reason for the heightened security. Accordingly, under any standard of review, the court did not err in denying M.C.'s motion for a mistrial.

### d. *Closing argument*

During closing argument, the Public Guardian argued M.C. was compliant with his medication only because there was a threat of an involuntary medication order. M.C. requested a sidebar with the court, which was not reported. During a subsequent break, M.C. moved for a mistrial, arguing the prosecutor's argument was improper because there was no evidence that M.C. was aware of an involuntary medication order. The Public Guardian asserted Aulakh had testified that he told M.C. about the order. M.C. responded that Aulakh was referring to an order for blood draws, not medication.

The court denied the motion, explaining the prosecutor's argument was a reasonable inference from the evidence. The court noted that, in its experience, involuntary medication orders do not identify specific procedures; instead, they defer to the doctor to determine what is necessary.

On appeal, M.C. contends the Public Guardian's argument was pure speculation as there is no evidence he was aware of an involuntary medication order. We disagree. Aulakh testified that he informed M.C. he had obtained a court order to draw his blood. Even assuming that order was limited to blood draws, it is reasonable to conclude it motivated M.C. to take his medication. According to Aulakh, one of the reasons to draw M.C.'s blood was to ensure he was compliant with his medication. It is reasonable to infer M.C. was aware of this fact and knew that, if his doctors discovered he was not taking his medication, they also could obtain a court order forcing him to do so. Accordingly, the Public Guardian's argument was a fair comment on the evidence, and it did not provide grounds for a mistrial under any standard of review.

## DISPOSITION

We affirm the order.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

LAVIN, Acting P. J.                    ADAMS, J.