Filed 10/23/14  P. v. Wolford CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E057122 |
| v. | (Super.Ct.No. RIF10005798) |
| STEPHEN JAMES WOLFORD, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Eric G. Helgesen, Judge (retired judge of the Tulare Mun. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Boyce & Schaefer and Robert E. Boyce for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry J.T. Carlton and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant, Stephen James Wolford, guilty of annoying or molesting a child under 18 years of age.[1] (Pen. Code, § 647.6, subd. (a)(1).)[2] The trial court granted defendant summary probation for a period of 36 months, with the conditions defendant serve 120 days in the custody of the county Sheriff and participate in an electronic monitoring (ankle bracelet) program. Defendant was also required to register as a sexual offender. (§ 290.)

Defendant raises seven issues on appeal. First, defendant asserts his conviction is not supported by substantial evidence. Second, defendant contends the trial court erred by admitting evidence of uncharged prior bad acts. There are four sub-issues raised within the second contention. Third, defendant asserts the trial court erred by admitting hearsay evidence. Fourth, defendant contends the prosecutor committed misconduct during closing argument. Fifth, defendant asserts his trial counsel rendered ineffective assistance. Sixth, defendant contends the cumulative effect of the alleged errors requires reversal. Seventh, defendant asserts mandatory sex offender registration for a section 647.6 conviction violates equal protection. We affirm the judgment.

---

[1] The jury was unable to reach a verdict on Count 1, an allegation of committing a lewd and lascivious act upon the body of a child who is 14 or 15 years old (Former Pen. Code, § 288, subd. (c)). The trial court declared a mistrial as to Count 1 and dismissed the charge in the interests of justice. (Pen. Code, § 1385.) The jury was split 8-4, with the majority voting not guilty.

[2] All subsequent statutory references will be to the Penal Code unless otherwise indicated.

2

## FACTUAL AND PROCEDURAL HISTORY

A. PROSECUTION'S EVIDENCE

 1. *BACKGROUND*

Defendant was a teacher at Eleanor Roosevelt High School (the high school) in Eastvale. Defendant taught drafting classes and had two classrooms. The victim, who is female, was a student at the high school. The victim was 15 years old in May and June 2010. The victim was not defendant's student; however, the victim and the victim's female friends would sometimes skip their scheduled classes and go to one of defendant's classrooms, where they could use the computers. Defendant told the girls they "should go back to class," but did not make them leave. The victim began going to defendant's classroom sometime between January and June 2010, and she went to his classroom "regularly."

 2. *ASSORTED INTERACTIONS*

On one occasion, when defendant observed the victim applying make-up, he said to her, "[You] can't fix perfection." The comment caused the victim to feel "[e]xtremely uncomfortable." On other occasions, defendant told the victim, "You're not like the rest of the girls," and told the victim he would give her "an automatic A," if she signed-up for his class. Between classes, during "passing periods," defendant tried to hug the victim.

The victim told defendant she wanted a yearbook, but her mother would not purchase one for her. Defendant gave the victim a yearbook. The victim was going to pay defendant back, but he told her it was a gift. Specifically, defendant said, "You

3

don't have to pay me back because you're my daughter, and I will take care of you."
On the yearbook page with photographs of defendant and the student club he coordinated, defendant placed two poems. When defendant gave the yearbook to the victim, he pulled her toward his teacher's desk, while students were on the opposite side of the classroom, and whispered both poems into her ear. The victim believed the other students could not hear defendant whispering the poems. The victim felt "very uncomfortable" when defendant gave her the yearbook. At times, defendant made comments "to all the girls in the class" saying, "You're my daughters; I'll take care of you."

In June 2010, the victim wanted to go to lunch at In-N-Out with two of her friends, Elvira and Areli.[3] The victim asked defendant to take her and her friends to the restaurant. The victim was "in [defendant's] face" asking "Can you take us? Can you take us?" Defendant "said no a couple times," but then agreed to take the victim and her friends.

Defendant drove the victim and her friends, and paid for the food. Defendant wanted the victim to sit in the front passenger seat of his car, but she refused. On the way back to school, defendant "took the long way," and said he wanted the girls to go swimming at his house. The girls did not go swimming at defendant's house. Elvira believed defendant paid more attention to the victim than the other girls, but that the victim also sought attention from defendant.

_____

[3] We use first names (omitting last names) because the people involved were minors at the time these events took place. No disrespect is intended.

### 3. *CANDY INCIDENT*[4, 5]

In May or June 2010, the victim's friend, Ivette wanted candy. Ivette told the victim to ask defendant for candy, because Ivette believed defendant liked the victim and would give her candy. Ivette believed defendant did not like Ivette and would not give her candy if she asked him. While defendant was teaching, the victim asked defendant for candy. He told her to wait until after class. The victim waited.

After class, the victim again asked defendant for candy. Defendant, the victim, and Ivette went to his other classroom. The classroom was empty. Defendant and the victim entered the classroom, while Ivette waited near the doorway, where she could see defendant and the victim. Defendant opened a storage cabinet that contained candy. Defendant told the victim to take all the candy she wanted. The victim took candy for Ivette. After the victim put the candy in her bag, defendant grabbed the victim's hand, pulled her toward him, and kissed her on her chest. The kiss fell above the victim's right breast, "several inches below her collarbone." Defendant's lips touched the victim's skin.

Ivette saw defendant hug the victim and "go towards her chest." Defendant's face was approximately three inches from the victim's chest when Ivette turned away

---

[4] At the trial court, the alleged kissing incident was referred to as "the candy incident." Defendant, in his briefs for this court, also refers to the alleged incident as "the candy incident." For the sake of continuity, we will use the same label.

[5] The candy incident comprised Count 1. The jury hung on Count 1, with an 8-4 split in favor of innocence. We present this portion of the record for the sake of defendant's procedural contentions.

and said "Let's go" to the victim. The victim felt "[d]isgusted" after the kiss. The victim left the classroom. The victim talked with Ivette about the kiss.

The victim continued going to defendant's classroom after the candy incident. The victim never had an assigned class with defendant, but continued going to his classroom "[t]o be with [her] friends."

4.      *LAW ENFORCEMENT*

Eventually, the victim told her former math teacher about the alleged candy incident. The victim talked to law enforcement about defendant's behavior. When speaking to a deputy, the victim said defendant kissed her shoulder during the candy incident. At trial, the victim explained "shoulder" was the wrong word to use to describe the placement of the kiss.

The victim testified that defendant only kissed her once, on a single occasion, i.e., the foregoing alleged "candy incident." The prosecutor asked the victim if she recalled telling an investigator that defendant kissed her twice on the forehead prior to the candy incident and twice on the forehead after the candy incident. The victim confirmed she did tell the investigator about four other kisses. The victim said the forehead kisses did occur and estimated defendant kissed her a total of five times, including the candy incident. Every time defendant kissed the victim, she felt uncomfortable.

When Ivette spoke to law enforcement, she said she saw defendant lean in to kiss the victim's cheek during the candy incident. At trial, Ivette clarified that she did not see defendant lean in to kiss the victim's chest, but she saw him "leaning towards her

6

chest." Ivette told a law enforcement officer she "never heard [defendant] say anything to [the victim]." At trial, Ivette said she had overheard defendant offer to buy the victim lunch and a yearbook, and tell the victim she was beautiful. At trial, Ivette admitted lying to the law enforcement officer. Prior to the end of the school year, defendant apologized to the victim for "making [her] feel uncomfortable."

### 5. *UNCHARGED PRIOR BAD ACTS*

#### a) <u>Comments</u>

John Murray (Murray) was an assistant principal at the high school from 2007 through June 2010. In 2008, a female sophomore[6] reported defendant made inappropriate sexual comments. The comments allegedly occurred when the student was alone with defendant "during after-school periods." Murray spoke to the student, the student's father, and defendant. Defendant said the student had misunderstood his use of sarcasm. Murray confirmed defendant had a sarcastic sense of humor, and that sarcasm in general can be misunderstood. Murray advised defendant to (1) avoid using sarcasm, and (2) avoid being alone with female students. Murray wrote a report about the concern with defendant's behavior, but kept the report for himself, it did not go into defendant's file.

Trevor Painton (Painton) was an assistant principal at the high school from 2006 to 2012. In March or April 2010, a student, Christy, told Painton that defendant was

---

[6] A sophomore is typically 15 years old.

making "[s]uggestive comments," with sexual connotations. Christy was a student in one of defendant's classes and described three separate incidents.

First, during a test, Christy jokingly said to defendant, "Come do my test for me." Defendant responded, "No, I won't do your test, but I will do you." The comment made Christy feel uncomfortable. Second, when Christy was wearing a skirt, defendant said, "[C]ome closer so I can lift your skirt up." The comment caused Christy to feel scared. Third, defendant instructed Christy to "spit [her] gum out." Christy said she was not chewing gum. Christy opened her mouth to show defendant. Defendant said, "Oh, I bet I can find it." The comment made Christy feel uncomfortable. Christy did not think defendant was joking because defendant would lean in and whisper the comments to her.

Christy said another student, Leslie, had comments whispered to her as well. Christy and Leslie were classmates, but not friends. Christy had seen defendant lean toward Leslie and whisper to Leslie, but Christy could not hear what defendant said. Painton spoke to Leslie, who confirmed defendant made inappropriate sexual comments. On one occasion, defendant told Leslie, in a joking manner, "he liked [her] back side better than [her] front side." Leslie asked defendant what he meant, because she thought he meant she was ugly. Defendant said it was "a compliment as he thought [she] had a cute butt." Defendant's comment made Leslie feel uncomfortable. On another occasion, when looking at photographs of Leslie's friends on the cover of her binder, defendant asked "when [she would be] able to print out some pictures for him to put up on his wall." Defendant also commented on whether Leslie's friends "were cute

8

or not." Defendant whispered the comments to Leslie. The comments made Leslie feel uncomfortable.

Painton spoke to defendant. Painton advised defendant not to be alone in his classroom with a student, although Christy and Leslie were in the classroom together when defendant allegedly made the sexual comments. Painton also advised defendant not to make comments that could be misinterpreted. Painton wrote a report about the concern with defendant's behavior, and placed the report in defendant's file.

b)      Rape

Angel is female. In early August 1994, Angel turned 15 years old. During that month, Angel and her stepfather lived in defendant's house in Corona, while Angel's mother and stepfather tried a trial separation. Angel and her stepfather lived at defendant's house for "a few months." Defendant was Angel's Sunday school teacher at church. Angel's stepfather worked until 11:00 p.m., so Angel was often home alone with defendant. At home, defendant often called Angel to sit with him in "whatever room he was in." Defendant frequently wanted to talk to Angel, which Angel found awkward. Angel described four incidents that occurred over the course of a three or four week period.

First, Angel walked by defendant while he was at the computer. Defendant grabbed Angel by her waist, sat her down on his lap, and held her there. Angel "tensed up" and waited for him to let her go. Second, when Angel was washing dishes, defendant "came up behind" her, stood "really, really, really close," so that she could

feel his breath on the back of her neck and his lips brush against her neck. Defendant's actions caused Angel to feel scared.

Third, Angel was laying on a bed, in the living room; Angel had fallen asleep watching television. Defendant came into the room, got into the bed, "spoon[ed]"[7] Angel, and placed her hand on his erect penis. The contact was skin-to-skin. Angel remained quiet, kept her eyes closed, and did not move. Defendant "didn't stay very long" and then got up and walked away.

Fourth, Angel was walking through a room, when defendant picked her up. Defendant cradled Angel with one arm behind her back and one arm behind her knees. Defendant took Angel to her bedroom. Defendant put Angel on her bed. Defendant removed Angel's underwear, and moved so he was on top of her. Defendant kissed Angel's breasts. Defendant tried to place his penis in Angel's vagina, while Angel tried pushing him off of her. Eventually, defendant penetrated Angel's vagina with his penis. The penetration was "[v]ery painful" to Angel. Defendant became frustrated because his penis "wouldn't fit" entirely in Angel's vagina, only "a couple inches" could penetrate. Angel continued trying to push defendant off of her, but did not say anything. Angel hoped defendant would "walk away or just let [her] walk away." Angel felt the penetration lasted approximately 10 to 15 minutes. Angel was unsure if defendant ejaculated. When the penetration ended, defendant told Angel "to get up and go take a shower."

---

[7] Angel was lying on her side, and defendant lay behind her, on his side, with the front of his body against the back of her body.

Angel was "very scared" by defendant's actions. Angel told a friend what defendant had done. In an act of retribution, a few of Angel's friends broke into defendant's house and "smash[ed] up his stuff." Angel did not immediately speak to law enforcement following the alleged rape, but did speak to officers approximately one or two weeks later. Angel submitted to a sexual assault examination. After police became involved, Angel moved into a female youth leader's home. Defendant was arrested for the alleged rape, but was not prosecuted.

B.     DEFENSE'S EVIDENCE

Both female and male students would skip their scheduled classes and spend the class time in defendant's classrooms. Areli was one of the girls who spent time with the victim in defendant's classroom. Areli recalled defendant threatening to call campus security if the students skipping their classes did not leave, but he only followed through once. On one occasion defendant said to a group of girls in the classroom, "[Y]ou're my daughter[s]. I'm going to take care of you." Areli did not find the comment odd or offensive, because defendant said it to a group. Areli saw defendant interact with the victim, and the victim never appeared uncomfortable around defendant.

Areli recalled the victim insisting defendant take them to a restaurant. Defendant initially refused. Defendant then offered to pick up food and bring it back, but the victim again insisted she wanted to leave campus. Defendant relented and took the victim, Areli, and Elvira to In-N-Out. It appeared to Areli that defendant did not want to take the three girls to the restaurant. Areli recalled defendant inviting the three girls to go swimming at his house, so they could meet his family. Defendant told the girls

11

that his wife and children were at his house.  Areli did not feel like she was in danger on the In-N-Out trip.  Areli believed the victim was also comfortable on the In-N-Out trip, because they were "goofing around in the back[seat] finishing [their] meal[s]."  Elvira also believed the victim was comfortable during the trip.

In June 2010, the victim had a "huge reputation of lying."  Areli believed defendant did not manipulate the victim, but the victim manipulated defendant.  For example, when the victim was late to class she would ask defendant for a pass.  Defendant told the victim, "I'm going to call security if you don't leave."  The victim would continue asking for a pass.  The victim was "extremely flirtatious with [defendant]," and the victim "love[d] attention."

Alexis was a student in defendant's class during her freshman year, and a teacher's assistant (T.A.) for defendant during her junior year of high school.  So, she was in defendant's class for two years.  Alexis recalled male and female students skipping their scheduled classes and going to defendant's class.  Alexis believed defendant treated males and females the same.  Defendant never said anything inappropriate to Alexis nor made her feel awkward.  The victim and her friends would sit in front of Alexis, "a few feet across from [her]," when they were in defendant's classroom.  Alexis never saw or heard defendant do anything inappropriate with other female students.

Jennifer was in defendant's homeroom class for three years.  Jennifer knew the victim and the victim's friends.  Defendant commented on Jennifer's toenails being nicely painted and said the girls in the class were his daughters and he would take care

of them; however, the comments did not make Jennifer uncomfortable. Jennifer understood the "daughters/taking care" comments to mean defendant would help them with their schoolwork. Defendant helped students with homework for their other classes, such as history class.

Jennifer saw the victim interact with defendant. The victim flirted with defendant and went "to his class every day." The victim always appeared to be comfortable with defendant. In June 2010, the victim had the reputation of being a liar. Jennifer "caught [the victim] in lies so many times."

Shianne was a student in defendant's class, and was in a student club that he coordinated. The club members went to a state competition in San Diego for four days. The club members stayed in a hotel while in San Diego. Shianne also went to defendant's classroom during lunch "when it wasn't nice" outside. Shianne never heard defendant say anything inappropriate to students. During a club trip to Ontario, Shianne was alone with defendant for one hour while waiting for her father to arrive. Defendant did not say anything inappropriate to Shianne while they were alone.

Kassandra went to defendant's classroom with the victim and her friends when skipping their scheduled classes. Defendant helped Kassandra with her history project when she was in his classroom. Defendant never made Kassandra feel uncomfortable. The victim never appeared uncomfortable around defendant. It appeared the victim was trying to get extra attention from defendant. The victim told Kassandra defendant purchased a yearbook on the victim's behalf, but the victim was supposed to pay him

13

back. The victim wanted defendant to purchase the yearbook because "he would get it cheaper."

Kassandra heard defendant make the comment about the girls being his daughters and taking care of them. Kassandra understood the comment to refer to defendant helping the girls with schoolwork and giving Kassandra food when she did not have food. Kassandra explained that she did not have the free breakfast program, so defendant would sometimes give her muffins.

Riverside County Sheriff's Deputy Lewis (Lewis) was a school resource officer for the high school in 2010. A teacher informed Painton, the assistant principal, about the alleged candy incident, and Painton contacted Lewis. Lewis spoke to the victim on June 16, 2010. The victim told Lewis defendant kissed her on the shoulder. The victim did not mention Ivette witnessing the kiss. Lewis told the victim this was a "he said/she said" case because there were not any witnesses. "[A]t some point," the victim told Lewis the kiss was on her chest. The victim told Lewis defendant had given her a yearbook, because she could not afford one, but did not mention poems appearing in the yearbook. The victim told Lewis she was uncomfortable around defendant. The victim continued going to defendant's classroom after the candy incident.

C.    CHARGES, CLOSING ARGUMENT, AND VERDICTS

During closing argument, the prosecutor asserted Count 1 consisted of the alleged candy incident. The prosecutor argued defendant's sexual intent in Count 1 was proven by his comments to the victim, such as, "You can't fix perfection; you're not like the other girls; you're pretty." Count 1 concerned an allegation of committing a

14

lewd and lascivious act upon the body of a child who is 14 or 15 years old (Pen. Code, § 288, subd. (c)). The jury was unable to reach a verdict on Count 1, and the court dismissed the charge. The jury was split 8-4, with the majority voting not guilty.

The jury found defendant guilty on Count 2, which was annoying or molesting a child under 18 years of age. (§ 647.6, subd. (a)(1).) The information reflected Count 2 was "a further and separate cause of action, being a different offense from but connected in its commission with the charge set forth in [C]ount 1." During closing argument, the prosecutor asserted Count 2 consisted of "all of the conduct, the kisses, the comments, all of that . . . ." When discussing defendant's sexual intent, the prosecutor asserted defendant's comments, such as, "You are my daughters; I'm going to take care of you," proved the intent element.

## DISCUSSION

### A. SUBSTANTIAL EVIDENCE

Defendant contends his conviction is not supported by substantial evidence. Specifically, defendant focuses on the first element of the offense, which is the conduct that comprises the act.

We review the record to determine whether any rational trier of fact could have found the essential elements of the crime were satisfied beyond a reasonable doubt. We view the record in the light most favorable to the prosecution; make all reasonable inferences in favor of the prosecution; and resolve all evidentiary conflicts in favor of the prosecution. We do not resolve credibility issues. "'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis [whatsoever] is

15

there sufficient substantial evidence to support'" the jury's verdict. [Citation.]'

[Citations.]" (*People v. Mecano* (2013) 214 Cal.App.4th 1061, 1068-1069.)

"Section 647.6, subdivision (a) does not require a touching, 'but does require (1) conduct a "'normal person would unhesitatingly be irritated by'" [citations], and (2) conduct "'motivated by an unnatural or abnormal sexual interest'" in the victim [citations].' The 'words "annoy" and "molest" [in the statute] . . . are synonymous and generally refer to conduct designed to disturb, irritate, offend, injure, or at least tend to injure, another person. [Citations.] . . . . [¶] "Annoy" and "molest" ordinarily relate to offenses against children, with a connotation of abnormal sexual motivation. The forbidden annoyance or molestation is not concerned with the child's state of mind, but rather refers to the defendant's objectionable acts that constitute the offense. [Citation.] [¶] Accordingly, to determine whether the defendant's conduct would unhesitatingly irritate or disturb a normal person, we employ an objective test not dependent on whether the child was in fact irritated or disturbed. [Citations.]' [Citation.]" (*People v. Brandao* (2012) 203 Cal.App.4th 436, 440-441 (*Brandao*), fn. omitted.)

In regard to the first element—conduct a normal person would unhesitatingly be irritated by—the victim testified that (1) defendant tried to hug the victim during passing periods; (2) defendant kissed the victim four times on her forehead; and (3) defendant pulled the victim to his desk and whispered poems in her ear. A reasonable person in a student/teacher relationship would not expect romantic interactions. Therefore, if a teacher kissed, whispered poetry, or attempted to hug the student at a random moment like a passing period, a reasonable person would be

16

disturbed by the teacher's actions, because the actions are unexpected and unwanted, as they fall outside the bounds of the typical student/teacher relationship. Accordingly, based upon this evidence, the jury could reasonably conclude defendant committed an act that was unhesitatingly irritating or annoying.

Defendant contends there is not substantial evidence supporting the finding he committed an irritating or disturbing act because "this was not a 'course of conduct crime'"; rather, the jury was instructed to select a particular act before convicting defendant of violating section 647.6 (CALCRIM No. 3500 [Unanimity]). In our discussion *ante*, we list three different possible acts that could have supported a finding of disturbing or unhesitatingly irritating conduct. We are not concluding that all three acts or the "course of conduct" are needed to support the conviction. We are concluding that any one of the three acts, by itself, would be sufficient: (1) trying to hug the victim during passing periods; (2) kissing the victim on her forehead; or (3) whispering poems in the victim's ear.

Defendant contends there is not substantial evidence supporting the finding he committed an irritating or disturbing act because (1) eight jurors implicitly found the victim's testimony to not be credible, based upon the result of Count 1; (2) the victim's testimony about the non-candy incident kisses was contradictory and/or inconsistent; (3) the victim had a reputation for lying; and (4) the victim could not provide details about the non-candy incident conduct.

Defendant's argument is unpersuasive because we cannot resolve issues of credibility. (*People v. Lee* (2011) 51 Cal.4th 620, 632.) The jury was free to "accept or

17

reject all or any part of [the victim's] testimony unless the testimony [was] inherently incredible." (*People v. Dilworth* (1969) 274 Cal.App.2d 27, 34.) There is no reason for concluding the victim's testimony is inherently incredible. A jury could reasonably conclude that kisses on the forehead are more believable than a kiss on the chest. Thus, the jury could reject the alleged candy incident, but find the forehead kisses occurred. The victim's reputation for lying does not equate to all of her testimony being false. The victim's inconsistent statements and lack of details were explained by the lapse of time between the incidents and trial. The victim explained that years had passed and she had difficulty recalling the details of the different incidents. The victim's explanation is reasonable given the two-year period between the incidents and trial. Since the victim's testimony is not inherently improbable, we conclude it constitutes substantial evidence.

### B. UNCHARGED CRIMES EVIDENCE

#### 1. *PROCEDURAL HISTORY*

Prior to trial, the court said it had discussed motions with the attorneys in chambers. On the record, the court remarked that one of the issues discussed in chambers was whether evidence of the uncharged alleged rape should be admitted, and a second issue was whether evidence of defendant's uncharged alleged comments to Christy and Leslie should be admitted.

Defendant argued the rape evidence was not probative because defendant's crimes were not committed in seclusion; rather, there was a witness—Ivette allegedly witnessed the candy incident. Defendant reasoned that prior crime evidence is usually

18

allowed because there are not witnesses to sex crimes, but since this crime had a witness, the prior crime evidence was not needed.

Additionally, defendant asserted the rape evidence was "very remote," because it was 18 years old.[8] Defendant argued that, due to the age of the alleged offense, it would be difficult "to do any real investigation into the facts and circumstances surrounding that."

Defendant argued that the rape evidence was unduly prejudicial, because rape allegations tend to evoke emotional responses. Defendant asserted he was charged with kissing the victim on her chest, above her breast, so evidence of rape in a trial about kissing "would be just so prejudicial that it would be impossible for [defendant] to get a fair trial." In regard to the alleged rape and charged crimes involving the same plan or

---

[8] The rape allegedly occurred in 1994. The charged crime in the instant case occurred in 2010. Accordingly, there was a 16-year gap between the charged crimes and the uncharged rape. Defendant's trial took place in 2012, so there was an 18-year gap between the alleged rape and the trial. At oral argument in this court, the People asserted the relevant amount of time for the "remoteness" factor is 16 years (uncharged crime to charged crime calculation), rather than 18 years (uncharged crime to trial calculation).

Both the 16 year and 18 year time periods are relevant. The 16-year gap is relevant to defendant's propensity to commit the charged crimes because the closer in time the crimes occur, the more probative the evidence is for proving defendant has the propensity to commit sexual offenses. (*People v. Branch* (2001) 91 Cal.App.4th 274, 285.) However, the 18-year gap is relevant to the prejudice side of the analysis. For example, it is relevant to defendant's ability to defend himself at trial against an 18-year-old allegation. (See *People v. Abilez* (2007) 41 Cal.4th 472, 501 [prior crime occurred "more than 20 years before the trial"].) We will use the 18-year calculation for the sake of consistency, since that was the calculation used when discussing the remoteness factor in the trial court.

motive (Evid. Code, § 1101, subd. (b)), defendant argued the crimes were dissimilar because a kiss and rape are not comparable.

In regard to the comments made to Christy and Leslie, defendant argued those alleged crimes were not similar because they were "just comments . . . . And whether or not they are even sexual in nature could be argued." Defendant argued there was no evidence of Christy or Leslie feeling as though defendant was making a sexual advance to them. Defendant argued, "there is nothing similar about a kiss on the cheek [and] a comment."

The prosecutor argued there is not a time limit on evidence of uncharged sexual crimes (Evid. Code, § 1108), and therefore the 18 year age of the alleged rape evidence was "not something that should even bear weight on the Court's decision in this instance." The prosecutor argued the rape evidence was more probative than prejudicial because Angel would not "just take the stand and say, yeah, he forcibly raped me"; rather, Angel would provide "extensive testimony" about the "several acts prior to the rape" in addition to the rape.

In regard to similarity, the prosecutor argued the relationship and the acts prior to the rape were similar to the charged offenses in the instant case. For example, defendant was Angel's Sunday school teacher, and he was a teacher at the victim's high school. Additionally, defendant "groomed" Angel by making comments to her and touching her, similar to the victim. The prosecutor asserted the rape evidence could be admitted under Evidence Code sections 1108 (prior sex crimes) or 1101, subdivision (b) (common plan or motive).

In regard to Christy and Leslie, the prosecutor argued those uncharged comments were similar to the instant case because defendant had a student/teacher relationship with Christy, Leslie, and the victim. The prosecutor asserted the uncharged comments were also similar because they made Christy and Leslie uncomfortable to the point of reporting the comments, which could reflect the comments were sexual in nature.

When issuing its ruling, the court explained its reasoning. The court said, "The rape is probably more inflammatory. I mean, clearly it is more inflammatory. But at the same time, I believe it might be more probative as well." The court agreed that the incidents involving Angel, prior to the rape, were similar to the charged crimes involving the victim. The court then said, "I concur with the People that under the law, the remoteness doesn't make a difference." The court then concluded the rape evidence could be admitted.

The trial court instructed the jury it could consider the rape evidence and comments as proof defendant had a propensity to commit sexual offenses (Evid. Code, § 1108), and as proof of common intent, motive, or plan (Evid. Code, § 1101, subd. (b)).

2. *DISCUSSION*

Defendant raises four sub-issues. First, defendant contends the trial court erred by admitting the rape evidence under Evidence Code section 1101, subdivision (b), because kissing and rape are not similar. Second, defendant contends the trial court erred by admitting the rape evidence because the court incorrectly concluded the remoteness of the offense was not relevant. Third, defendant asserts the trial court erred by admitting all the uncharged offense evidence, because the evidence was more

prejudicial than probative.  Fourth, defendant asserts the trial court erred by admitting all the uncharged offense evidence under Evidence Code section 1108 because it violated due process.

a)     <u>Evidence Code section 1101, subdivision (b)</u>

Defendant contends the trial court erred by admitting the rape evidence under Evidence Code section 1101, subdivision (b), because kissing and rape are not similar. Defendant also contends the trial court erred by admitting the evidence of comments made to Christy and Leslie because kissing and comments are not similar.

"Generally, the prosecution may not use a defendant's prior criminal act as evidence of a disposition to commit a charged criminal act.  [Citation.]  But evidence is admissible 'when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge . . .) other than his or her disposition to commit such an act.'  [Citation.]

"'To be admissible to show intent, "the prior conduct and the charged offense need only be sufficiently similar to support the inference that defendant probably harbored the same intent in each instance."'  [Citations.]  To be admissible to show a common scheme or plan, a greater degree of similarity is required than to show intent, and 'the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual.' [Citation.]"  (*People v. Davis* (2009) 46 Cal.4th 539, 602.)

In Count 1, defendant was charged with a lewd or lascivious act.  (§ 288, subd. (c)(1).)  The crime requires "the intent of arousing, appealing to, or gratifying the lust,

22

passions, or sexual desires of that person or the child." (§ 288, subds. (a)&(c)(1).) Accordingly, the prosecution was required to prove intent. As a result, we address the issue of whether the crimes are sufficiently similar to support the inference that defendant probably harbored the same intent in each instance. (*People v. Johnson* (2013) 221 Cal.App.4th 623, 635.)

As set forth *ante*, "[t]he least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' [Citation.]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.) We apply the abuse of discretion standard of review. (*People v. Abilez* (2007) 41 Cal.4th 472, 500.)

The victim in the instant case had a student/teacher relationship with defendant. Angel had a student/teacher relationship with defendant through Sunday school. The victim and Angel were both female and approximately 15 years old when the respective incidents occurred or were alleged to have occurred. The victim described comments defendant made, attempted hugs, kisses on the forehead, and a kiss on the chest. The acts described by the victim reflect escalating sexual behavior. Angel described being made to sit on defendant's lap, defendant's lips brushing against her neck, defendant causing Angel to touch defendant's penis, and defendant raping her. The incidents involving Angel also reflect escalating sexual behavior. Given the student/teacher

relationship similarity, the victims' similar ages, and the escalating behavior described by the victim and Angel, the acts were sufficiently similar to support the inference that defendant probably harbored the same intent in each instance. Accordingly, we conclude the trial court did not err because it was within the bounds of reason to find the offenses sufficiently similar.

Next, we address the comments made to Christy and Leslie. Defendant had a student/teacher relationship with Christy and Leslie. Defendant also had a student/teacher relationship with the victim. Christy was 15 years old when defendant whispered comments to her. Leslie was 15 or 16 years old when defendant made comments to her. The victim was also 15 years old when defendant made comments to her. The comments to the victim, Christy, and Leslie were made during the same school year.

Defendant told Christy he would "do" her, told her he would "find" the gum in her mouth, and said he would lift her skirt. Defendant complimented Leslie's "cute butt," asked for photographs of her friends, and discussed whether her friends were "cute." Defendant told the victim she was "perfection," offered to give her an A if she took his class, and recited poetry to her. Christy, Leslie, and the victim said defendant whispered his comments to them.

The offenses are similar because the victim, Christy, and Leslie were approximately the same age, shared student/teacher relationships with defendant, the comments were made during the same school year, the comments were whispered, and all the comments could be understood as having sexual connotations. Given these

24

similarities, the prior offense evidence involving Christy and Leslie helps to support the inference that defendant probably harbored the same intent in each instance. Accordingly, we conclude the trial court did not err because the ruling was within the bounds of reason.

The trial court told the jury it could consider the uncharged misconduct for proof of a common plan, as well as intent. A higher degree of similarity is needed for common plan evidence than intent evidence. (*People v. Davis*, *supra*, 46 Cal.4th at p. 602.) Based upon the similarities discussed *ante*, we conclude it was within the bounds of reason for the evidence to also be used as proof of a common plan. The multiple commonalities of the ages, student/teacher relationships, sexual comments, and escalating sexual behavior cause the uncharged offense evidence to meet the higher level of similarity needed for proof of a common plan.

b) Remoteness

Defendant contends the trial court erred by admitting the rape evidence because the court incorrectly concluded the remoteness of the offense was not relevant.

When considering whether to admit evidence under Evidence Code section 1108, a trial court must weigh the probative value of the evidence against the possible undue prejudice that would arise from such evidence (Evid. Code, § 352). When engaging in this weighing process, the trial court "must consider such factors as the [uncharged offense's] nature, relevance, and *possible remoteness*, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on

25

the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense. [Citations.]" (*People v. Falsetta* (1999) 21 Cal.4th 903, 917, italics added (*Falsetta*).)

The prosecutor submitted written motions in limine. In a written motion, the prosecutor noted the alleged rape "occurred 18 years ago." The prosecutor argued that the rape was similar to the charged crimes, due to the victim's and Angel's ages, defendant's position of authority over both girls, and the gradual "grooming" behavior defendant displayed with both girls. The prosecutor asserted Evidence Code section 1108 does not have a time limit for prior offenses "thus implying that conduct of *any* remoteness should be admitted."

At the motion hearing, the prosecutor said, "Evidence Code Section 1108 doesn't have a ten-year time limit restriction as 1109 does. So I—as I argued in my written motion as well, that is not something that should even bear weight on the Court's decision in this instance." When the trial court issued its ruling, it said, "And I concur with the People that under the law, the remoteness doesn't make a difference."

A trial court "is presumed to have considered all of the relevant factors in the absence of an affirmative record to the contrary." (*People v. Myers* (1999) 69 Cal.App.4th 305, 310.) The trial court's comments reflect the trial court understood remoteness was a factor to be considered. For example, the trial court did not say remoteness was irrelevant. Rather, the trial court said the 18 year age of the alleged

26

rape "doesn't make a difference." The court's comment can be interpreted as concluding the remoteness of the crime had little impact on the weighing process in light of the perceived factors favoring admission of the rape evidence, such as the similarities between the alleged rape and the charged crimes. Since it has not been affirmatively demonstrated that the trial court ignored the remoteness factor, we conclude the trial court did not err.

      c)      <u>Balancing</u>

Defendant contends the trial court erred by admitting all the uncharged offense evidence, because the evidence was more prejudicial than probative. (Evid. Code, § 352.) Specifically, defendant asserts the uncharged offense evidence was unduly prejudicial because (1) the rape and comments were not similar to the charged offenses; (2) the rape was remote in time; (3) none of the uncharged incidents resulted in a conviction; (4) five witnesses testified about the uncharged incidents, which was over half of the witnesses presented by the prosecution in the case; (5) jury instructions were given concerning rape;[9] and (6) closing arguments were given related to rape.

---

[9] Defendant raises an additional issue concerning the wording of the rape jury instruction. In particular, defendant is concerned with the wording: "'the People presented evidence that the defendant *committed* the crimes of rape and annoying or molesting a child that were not charged in this case.'" Defendant asserts the wording gave the jury the impression that defendant did rape Angel and make inappropriate comments to Christy and Leslie. Defendant has raised this alleged instructional error within the Evidence Code section 352 balancing argument and the related harmless error argument. We do not address the alleged instructional error as an independent contention, due to it being combined with another topic. It does not appear defendant intended this to be an independent issue. (Cal. Rules of Court, rule 8.204(a)(1)(B) [separate headings].)

Evidence of uncharged misconduct may only be presented to a jury if the probative value of the evidence outweighs the potential prejudice the evidence may create. (Evid. Code, § 352; *People v. Rocha* (2013) 221 Cal.App.4th 1385, 1397.)

As set forth *ante*, when engaging in the balancing process for Evidence Code section 352, the trial court "must consider such factors as the [uncharged offense's] nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense. [Citations.]" (*Falsetta*, *supra*, 21 Cal.4th at p. 917.)

We apply the abuse of discretion standard when reviewing the trial court's ruling. (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.) Under this standard, an appellate court cannot substitute its judgment for the trial court's judgment. A trial court only abuses its discretion when "'its decision is so irrational or arbitrary that no reasonable person could agree with it.' [Citations.]" (*People v. Philpot* (2004) 122 Cal.App.4th 893, 904-905.)

We have explained *ante*, that three acts of uncharged misconduct were similar to the charged offenses. We will not repeat that analysis here. However, the fourth act of misconduct—the student complaint discussed by Murray—also involved a female

28

student, who was approximately 15 years old, and comments with a sexual connotation. Given the student/teacher relationship, the age of the anonymous student, and the sexual comments, this incident is also similar to the charged offense of annoying or molesting a minor because the victim also had a student/teacher relationship with defendant, was 15 years old, and suffered defendant making sexual comments to her. Accordingly, we conclude, as discussed *ante*, that the uncharged misconduct was similar to the charged offenses.

Assuming that the remainder of defendant's argument is correct (everything other than the similarity component): the rape was remote in time, the uncharged misconduct consisted only of allegations (not convictions), and the uncharged misconduct consumed a significant portion of the trial, a reasonable person could still conclude the probative value of the evidence outweighed these prejudice factors. In particular, when the anonymous student complained to Murray, defendant explained the student had misunderstood defendant's use of sarcasm. When Assistant Principal Painton handled Christy's and Leslie's complaints, Painton again advised defendant not to make comments that could be misinterpreted.

The uncharged comment evidence was probative because it helped the jury to understand that the comments made to the victim about "perfection" and getting "an automatic A" were not innocent or sarcastic comments that were simply misunderstood. When taken in isolation, each comment can be explained away. However, when the uncharged incidents are presented, it becomes more difficult to deny the sexual motivation in making the comments. The prosecution was required to prove defendant

29

was motivated by a sexual interest in children. (§ 647.6, subd. (a); *Brandao*, *supra*, 203 Cal.App.4th at pp. 440-441.) Therefore, the uncharged comment evidence had probative value because the frequency of the charged and uncharged sexual comments creates an improbability that the comments were innocent mistakes. (See *People v. Rocha*, *supra*, 221 Cal.App.4th at pp. 1395-1396 ["the intermediate inference justifying proof of intent by evidence of uncharged misconduct is 'the objective improbability of the accused's innocent involvement in so many similar incidents'"].)

The rape evidence, including the events prior to the rape, had probative value because it provided proof that defendant was sexually interested in 15-year-old girls. The comments were frequent and the girls testified that the comments made them uncomfortable, but the sexual nature of the comments could be explained away by the evidence that defendant had an "awkward" personality and was often sarcastic, as testified to by Murray. The rape evidence reflected defendant had a sexual interest in 15-year-old girls, which helped to overcome the evidence of possible innocent motivation behind the comments, attempted hugs, and kisses. Thus, the rape evidence had probative value in relation to proving defendant (1) was motivated by a sexual interest in children (§ 647.6, subd. (a)), and (2) acted "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child" (§ 288, subd. (a)&(c)(1)).

Thus, we have assumed defendant's prejudice arguments are correct (with the exception of similarity) and we have concluded the evidence also had probative value. A reasonable person could conclude the probative value of the evidence was stronger

30

than the potential prejudicial effect because the pattern of defendant's conduct was strong proof of sexual intent and motivation, thus creating high probative value; while the 18 year age of the rape allegation tended to blunt the inflammatory effects of the allegation, e.g. the jury saw Angel as an adult, not a 15 year old, and presumably defendant had been free of any sexual offense allegations for an 18-year period. In sum, a reasonable person could weigh the probative value and prejudicial effect and conclude the probative value outweighed the potential prejudicial effect. Accordingly, we conclude the trial court did not abuse its discretion.

### d) Due Process

Defendant asserts the trial court erred by admitting all the uncharged offense evidence under Evidence Code section 1108 because it violated due process. Defendant concedes the California Supreme Court, in *Falsetta*, concluded the admission of propensity evidence pursuant to Evidence Code section 1108 does not violate due process, because of the Evidence Code section 352 balancing process. (*Falsetta*, *supra*, 21 Cal.4th at pp. 917, 922.) In *Falsetta*, the California Supreme Court wrote that its conclusion was "consistent with prior state and federal case law." (*Id.* at p. 922.)

Defendant asserts the United States Supreme Court has yet to issue an opinion on the due process implications of propensity evidence admitted pursuant to Evidence Code section 1108. We infer defendant is attempting to preserve this issue for federal appellate review because we are bound by the California Supreme Court's opinion in *Falsetta*. (*Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57

31

Cal.2d 450, 455-456.)  Since we are bound by the precedent of *Falsetta*, we conclude

the admission of propensity evidence did not violate defendant's right of due process.

        e)     <u>Harmless Error</u>

We have concluded the trial court did not err.  However, if any error could be

found in admitting the uncharged rape evidence, we would find the error to be harmless.

We apply the *Watson* standard, determining if it is reasonably probable a result more

favorable to defendant would have been reached if the rape evidence had not been

admitted.  (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Jandres* (2014) 226

Cal.App.4th 340, 357 [applying the *Watson* standard to an Evidence Code section 1108

error].)

Angel, the alleged rape victim, had credibility issues.  Angel said she was

"frazzled" and "very tired" while testifying.  Angel admitted abusing

methamphetamines in the past.  Angel blamed her first failure to appear to testify in the

case on missing her flight due to her seven-year-old child taking and hiding her driver's

license.[10]  Angel blamed her second failure to appear to testify in the case on the airline

and/or travel agent.  At the end of the cross-examination, defendant's trial counsel asked

Angel if she was "under the influence of anything."  Angel denied being under the

influence.  Defendant's trial counsel described Angel as "stammer[ing]" and "mumbling

to herself" on the witness stand.

---

     **10**  Angel twice failed to appear as scheduled to testify in this case.  The trial court issued a bench warrant for Angel's arrest, and she appeared the following day.

The victim of the charged offense also had credibility issues. For example, there was testimony that, in June 2010, the victim had a "huge reputation of lying." As set forth *ante*, the jury was unable to reach a verdict on Count 1, an allegation of committing a lewd and lascivious act upon the body of a child who is 14 or 15 years old. (Former Pen. Code, § 288, subd. (c).) The trial court declared a mistrial as to Count 1 and dismissed the charge in the interests of justice. (Pen. Code, § 1385.) The jury was split 8-4, with the majority voting not guilty. Defendant was found guilty only of the misdemeanor offense of annoying or molesting a child under 18 years of age. (§ 647.6, subd. (a)(1).)

It appears from the verdict and mistrial that the uncharged rape evidence had little impact on the jury, since the jury did not find defendant guilty of the felony. It can be inferred from the jury finding defendant guilty only on the misdemeanor that the jury likely disregarded Angel's testimony, and credited the repeated testimonies regarding defendant making inappropriate comments. The jury likely credited the testimony of the prosecution's witnesses regarding the alleged inappropriate comments because defense witnesses corroborated the testimony. Defense witnesses Areli, Jennifer, and Kassandra recalled defendant telling a group of girls that they were his daughters and he would take care of them. Jennifer also recalled defendant complimenting her toenail polish.

When the prosecutor argued that the jury should find defendant guilty of making inappropriate comments, the prosecutor primarily used the comments themselves to

33

support a finding that defendant was motivated by an unnatural or abnormal sexual interest in the victim.

The prosecutor argued, "The defendant was motivated by an unnatural or sexual interest in the child. You are my daughters; I'm going to take care of you. As hard as defense [counsel] tried to spin it that he said it, you know, in this protective manner and gave them food, you even heard Kassandra say, oh, well, he gave me food. I don't know about anyone else. [¶] And these [school] barbecues and the lunch that was thrown with another teacher for all of the students, he didn't say then, You are my daughters. No. It was to this specific group of girls, these 15-year-olds that excited him, that he had a sexual interest in.

"The pattern of the 15-year-olds. Again, this is where you get to look at his other conduct. And who am I talking about again? I'm talking about Christy and Leslie. I did it wrong. Sorry. Angel, Christy, Leslie, and of course [the victim]. A child under 18 years old. Again, [the victim] is—was 15 at the time." The rape evidence was not the primary evidence supporting a finding of sexual intent. The prosecutor mentioned Angel but did not belabor the rape evidence in proving the motivation factor.

Accordingly, based upon the jury not finding defendant guilty of the felony, the inference that the jury found the rape evidence lacking credibility, and the prosecutor relying on other evidence in addition to the rape to support the motivation finding for the misdemeanor, we conclude that it is not reasonably probable a result more favorable to defendant would have been reached if the rape evidence had not been admitted.

C.     HEARSAY

1.     *PROCEDURAL HISTORY*

Prior to trial, defendant raised a hearsay objection to Murray's testimony. Defendant objected to Murray testifying about a complaint made by an anonymous student. The prosecutor said she would not ask Murray about the specifics of the student's allegations. Instead, she would "ask if allegations were brought to his attention and what he did as a result of it and how he counseled the defendant." The prosecutor asserted the testimony was relevant to the element of intent. The trial court said it would "probably need a little more detailed information," and would need to consider "the state of the evidence" at the point Murray is called as a witness, before issuing a ruling.

During trial, outside the presence of the jury, the prosecutor offered to "make the record [she] made in chambers." The prosecutor made an offer of proof concerning Murray. The prosecutor explained it came to "Murray's attention that a student had a complaint about the defendant regarding sexual comments being made toward her," Murray investigated the complaint, and he counseled defendant.

The court explained that since the student who complained to Murray was not testifying at trial, the statements the student made to Murray would not be admissible. The prosecutor agreed and said she did not plan to ask Murray about the student's statement. The court said, "So I think it would just be that something came to his attention and he felt the need to counsel with the defendant."

The prosecutor argued that defendant's statement about the comments being sarcastic was an admission that he made the comments. Defendant asserted it was Murray, not defendant, who first suggested the student misunderstood defendant's use of sarcasm. The court ruled Murray could be examined and cross-examined about who first suggested the comments were sarcastic.

During Murray's testimony, the following exchange took place:

Prosecutor: "What was the inappropriate conduct that was brought to your attention? And before you answer, not the exact words but the—in general, what was the conduct?

"[Murray:] The complaint came from a student, and she mentioned that she felt uncomfortable about some of the comments that were made to her after school. It was during after-school periods of time. And she had been in the classroom by herself with [defendant] and said there was some sexually—sexual comments—or sexual in nature. And I believe they were in the lines of—

"The Court[:] I would cut you off at that point.

"[Prosecutor:] That's fine.

"[Murray:] Sorry."

Later in Murray's testimony, he explained, "When I presented the allegation to [defendant], he mentioned that sometimes students misconstrue his use of sarcasm and they can read some things into what is said that he does not intend." As a result of that discussion, Murray counseled defendant to (1) avoid being alone with female students, and (2) avoid using sarcasm.

2.     *ANALYSIS*

Defendant asserts the trial court erred by admitting Murray's hearsay testimony regarding the unidentified student's complaint.

"'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200.) The adoptive admission rule is an exception to the hearsay rule. The adoptive admission rule provides, "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (Evid. Code, § 1221.)

"For the adoptive admission exception to the hearsay rule to apply, no 'direct accusation in so many words' is necessary. [Citation.] Rather, it is enough that the evidence showed that the defendant participated in a private conversation in which the crime was discussed and the circumstances offered him the opportunity to deny responsibility or otherwise dissociate himself from the crime, but that he did not do so. [Citation.]" (*People v. Davis* (2005) 36 Cal.4th 510, 539.)

"In determining whether a statement is admissible as an adoptive admission, a trial court must first decide whether there is evidence sufficient to sustain a finding that: (a) the defendant heard and understood the statement under circumstances that normally would call for a response; and (b) by words or conduct, the defendant adopted the statement as true. [Citations.]" (*People v. Davis*, *supra*, 36 Cal.4th at p. 535.)

"We apply the abuse of discretion standard in reviewing the trial court's determination to admit or exclude hearsay evidence. That standard applies to questions about the existence of the elements necessary to satisfy the hearsay exception. [Citations.]" (*People v. Pirwani* (2004) 119 Cal.App.4th 770, 787.)

Murray explained that when he spoke to defendant, Murray informed defendant "it would likely be a summary of the conference," which means Murray "go[es] through and outline[s] the concerns that were presented by the student or by whoever it was, and then as some point [Murray] would also probably provide some recommendations as to remedy the situation," then a record of the conversation would be put "on paper." Murray testified that he "presented the allegation to [defendant], he mentioned that sometimes students misconstrue his use of sarcasm and they can read some things into what is said that he does not intend."

We begin with the first factor—the defendant heard and understood the statement under circumstances that normally would call for a response. It can reasonably be concluded defendant heard and understood the accusation presented by Murray because defendant responded to it. It can also be reasonably found that the circumstances would normally call for a response because (1) defendant responded to Murray, and (2) Murray explained to defendant that the conversation was part of the "conference summary" procedure, which would result in a record of their interaction. Thus, defendant could reasonably be expected to respond to the allegations against him. Accordingly, the trial court could reasonably conclude defendant heard and understood the statement under circumstances that would normally call for a response.

Next, we address whether the trial court reasonably found by words or conduct, the defendant adopted the statement as true. "The statute contemplates either explicit acceptance of another's statement or acquiescence in its truth by silence or equivocal or evasive conduct." (*People v. Combs* (2004) 34 Cal.4th 821, 843.) Defendant responded to the accusation by explaining, "sometimes students misconstrue his use of sarcasm and they can read some things into what is said that he does not intend." Defendant did not deny making the statements; rather, defendant explained only that he had an innocent state of mind. Defendant's response could reasonably be found to be an adoption of the statements, in the sense that he admitted having made the statements to the student, and agreed the student complained; he only disagreed on his state of mind in making the statements. Accordingly, since the trial court could reasonably find both factors are supported by the record, we conclude the trial court did not err.

Defendant asserts the adoptive admission exception does not apply because "[n]othing established [defendant] had knowledge of the student's accusation; Murray only stated [defendant] was told there an allegation." Contrary to defendant's assertion, Murray did not say he told defendant "an allegation," he said he "presented *the* allegation." (Italics added.) Murray explained that as part of the summary conference procedure he "go[es] through and outline[s] the concerns that were presented by the student," and then makes recommendations to the accuser. Thus, part of the conversation was presenting the student's allegation to defendant. In this case, there was only one allegation, i.e., "the allegation." As a result, it can reasonably be found that defendant heard and understood the allegation against him.

39

Within defendant' harmless error argument, he discusses how admitting evidence of uncharged misconduct alleged by an unidentified student violated his right of due process. Since this due process argument was combined with the harmless error argument, we choose to not address it because it appears it was meant more as support for the prejudice theory; it was not intended to be an independent issue. (Cal. Rules of Court, rule 8.204(a)(1)(B) [separate headings].)

### D.    PROSECUTORIAL MISCONDUCT

#### 1.    *PROCEDURAL HISTORY*

Defendant raises issues with three different aspects of the prosecutor's closing argument. The first issue concerns the prosecutor's references to statements a juror made during voir dire. The prosecutor said, "I have no doubt that [the] defense is going to get up here and make a big deal about cheek versus forehead. But hopefully everyone here remembers [Juror No. 12's] New Year's Eve party. Because it didn't matter what songs were playing in the background; it doesn't mean [Juror No. 12] didn't have a party going on. It doesn't mean that he didn't kiss her four other times."

The second issue concerns "community" arguments made by the prosecutor. The prosecutor said, "Like I started my argument, this case is about trust and confidence in our teachers. It's about teachers having boundaries. It's about protecting our students, protecting our children. And that's what I'm asking you to do today. Protect our children and our community by finding the defendant guilty as charged."

The third issue is related to the prosecutor discussing Angel. The prosecutor said, "And quite honestly, ladies and gentlemen, [Angel] was victimized all over again yesterday when she had to relive that pain."

2.      *ANALYSIS*

a)      Contention

Defendant contends the prosecutor committed misconduct (1) when referencing Juror No. 12; (2) when urging the jury to protect our community; and (3) when discussing Angel being victimized "again" by testifying.

b)      Forfeiture and Ineffective Assistant of Counsel

The People contend defendant forfeited his prosecutorial misconduct contention by failing to object in the trial court. Defendant asserts the contention was not forfeited because an admonition by the trial court would not have cured the harm. (*People v. Arias* (1996) 13 Cal.4th 92, 159 [prosecutorial misconduct is not forfeited if "an objection would have been futile or an admonition ineffective].) If the contention is forfeited due to a lack of objections then, in the alternative, defendant asserts his trial counsel was ineffective for failing to object to the alleged misconduct. We choose to address the merits of the misconduct contention, rather than address the waiver and ineffective assistance of counsel issues.

c)      Law

"'A prosecutor's rude and intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." [Citation.] But conduct

41

by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves "'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'" [Citations.]'" (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214-1215.)

### d) Juror No. 12

Defendant contends it was misconduct for the prosecutor to (1) address a particular juror, and (2) argue facts not in evidence for purposes of establishing the victim's credibility.

#### (1) *Individual Juror*

Prosecutors should address the jury as a body, rather than addressing individual jurors. (*People v. Wein* (1958) 50 Cal.2d 383, 395-396 [partially abrogated by statute, on a different point]; *People v. Sawyer* (1967) 256 Cal.App.2d 66, 78.) In the instant case, the prosecutor discussed voir dire statements made by Juror No. 12. The prosecutor did not address Juror No. 12 directly. The prosecutor spoke to the jury as a body about Juror No. 12's statements. Accordingly, we conclude the prosecutor did not commit misconduct, because the prosecutor did not address an individual juror.

#### (2) *Facts Not in Evidence*

"""[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are

42

common knowledge or are illustrations drawn from common experience, history or literature." [Citation.]'" (*People v. Brown* (2004) 33 Cal.4th 382, 399-400.)

The prosecutor's comments about Juror No. 12 recalling songs are not completely clear from the record; however, it can be inferred Juror No. 12 made a statement during voir dire about being able to recall music playing at a New Year's Eve party, but being unable to recall exactly what songs were playing. The prosecutor's comments about Juror No. 12's statements were meant to evoke the common experience of forgetting details over time. The prosecutor was using the statement as an illustration of that common experience. The prosecutor could have easily removed "Juror No. 12" from the statement and used the same example. For instance: "The victim forgot some details of the incidents. People often forget details over time. It is common to recall listening to music at a party, but it is also common to forget the exact songs one heard when two years have passed since the date of the party." The point here is that the prosecutor was illustrating a common experience. The prosecutor did not argue facts not in evidence. Accordingly, we conclude the prosecutor did not commit misconduct.

e)      Community

Defendant contends the prosecutor committed misconduct by asking the jury to protect the community and our children.

Defendant relies generally on the case law establishing that "a prosecutor commits misconduct in making comments calculated to arouse passion or prejudice." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1379.) More specifically, defendant relies on federal case law explaining that "[a] prosecutor may not urge jurors to convict a

criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence. Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem. The amelioration of society's woes is far too heavy a burden for the individual criminal defendant to bear." (*U.S. v. Monaghan* (D.C. Cir. 1984) 741 F.2d 1434, 1441, fns. omitted; see also *U.S. v. Weatherspoon* (9th Cir. 2005) 410 F.3d 1142, 1149 [quoting *Monaghan*].)

For reference, the prosecutor said, "Like I started my argument, this case is about trust and confidence in our teachers. It's about teachers having boundaries. It's about protecting our students, protecting our children. And that's what I'm asking you to do today. Protect our children and our community by finding the defendant guilty as charged."

We begin with the "boundaries" portion of the argument. As set forth *ante*, to prove a violation of section 647.6, subdivision (a), there must be proof defendant's conduct would unhesitatingly irritate a normal person. Whether the victim was irritated or disturbed is not the issue—it is an objective examination. (*Brandao*, *supra*, 203 Cal.App.4th at pp. 440-441.)

The prosecutor's argument reflects the idea that defendant breached the community's standards or "boundaries." By violating these norms, it can be established that a reasonable person would be disturbed or unhesitatingly irritated by defendant's behavior. In other words, it does not appear the prosecutor's "boundaries" statements

were calculated to inflame the passions or prejudices of the jury. Instead, the prosecutor was making a point about the violation of community "boundaries," which would cause a person to be disturbed or irritated.

We now turn to the "protection" portion of the argument. The prosecutor's comments about protecting the community were directed at defendant's misconduct. The prosecutor did not identify a particular social problem that defendant's conviction would solve, and did not state defendant was bound to commit future crimes. The gist of the prosecutor's "protection" statements was that, by returning a guilty verdict, the jury could indicate its view that defendant's conduct was a violation of the community's (state's) law. In sum, we conclude the prosecutor's arguments were not calculated to arouse the passions and prejudices of the jury.

### f)      Victimized

#### (1)      *Contention*

Defendant contends the prosecutor committed misconduct by arguing Angel was victimized "again" by testifying because the prosecutor appealed to the jury's sympathy and vouched for Angel's credibility.

#### (2)      *Law*

""""[A]n appeal for sympathy for the victim is out of place during an objective determination of guilt."" [Citations.]" (*People v. Vance* (2010) 188 Cal.App.4th 1182, 1192.) Additionally, a "prosecutor is generally precluded from vouching for the credibility of her witnesses." (*People v. Anderson* (1990) 52 Cal.3d 453, 479.) However, arguments made in response to defense counsel's arguments are not

45

misconduct. Our Supreme Court held, "[E]ven otherwise prejudicial prosecutorial argument, when made within proper limits in rebuttal to arguments of defense counsel, do not constitute misconduct. [Citation.]" (*People v. McDaniel* (1976) 16 Cal.3d 156, 177.)

### (3)    *Defense's Argument*

During defense counsel's closing argument, he attacked Angel's credibility. Defense counsel (Lapine) directed the jury to the instruction permitting the jury to consider a witness's behavior on the stand when determining the witness's credibility. Lapine asserted Angel's behavior caused her to not be credible. Lapine argued, "I asked her if she was under the influence of methamphetamine because, frankly, that is what it appeared like. And then she stammered for a couple minutes. Well, no. It's been a year since I used meth. Really? After just about every answer she gave, she stammered and was mumbling to herself. Was she a credible witness?

### (4)    *Prosecutor's Rebuttal Argument*

During the prosecutor's rebuttal argument, the prosecutor said, "[Angel] was victimized all over again yesterday when she had to relive that pain. She was very human on that stand. She was thinking out loud, trying to remember. . . . [¶] And the mumbling to herself, again, she was thinking out loud. She tried to pour the water. And I don't know if any of you heard, but I did. She said, ["]How does this thing work,["] as she was fiddling with it. That doesn't make her crazy. That doesn't make her on methamphetamine, which, by the way, she didn't stutter. She flat out told the jury, no, I haven't done methamphetamine in a year. There was no stuttering. Mr. Lapine just

46

wants you to believe there was because he doesn't want you to believe a word she said because she was so credible."

(5)     *Credibility*

The prosecutor's remarks did not vouch for the victim's credibility. The prosecutor argued Angel was a credible witness, but did not state that evidence outside the record, such as the prosecutor's beliefs, indicated Angel was being truthful. The prosecutor relied on Angel's testimony and conduct to assert Angel was being honest. For example, the prosecutor explained why Angel appeared to be muttering and asserted Angel did not stutter, in order to establish that Angel was not under the influence of methamphetamine. Accordingly, we conclude the prosecutor did not improperly vouch for Angel's credibility.

Defendant asserts that by arguing Angel was "victimized all over again," the prosecutor vouched for the truth of Angel's rape allegation. "'[S]o long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief," her comments cannot be characterized as improper vouching.' [Citations.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 337.) Angel testified that she was raped by defendant. The prosecutor's comments are referencing Angel as a victim based upon Angel's testimony. The argument is not referencing outside personal knowledge of Angel's veracity. Accordingly, we conclude the prosecutor did not commit misconduct.

47

(6)    *Sympathy*

We now turn to the sympathy issue.  When the prosecutor argued that Angel was "victimized all over again," the prosecutor's point was that there was a reason for Angel's muttering and fumbling with the water pitcher.  The prosecutor was not evoking the jury's sympathy for Angel.  Rather, the prosecutor was attempting to respond to Lapine's argument about Angel's credibility.  The prosecutor wanted the jury to see Angel as a person who was struggling with the pain of recalling her rape, as opposed to struggling with the effects of methamphetamine.  The argument was about credibility, not sympathy.  Accordingly, we conclude the prosecutor did not commit misconduct by appealing to the jurors' sympathy; the prosecutor was merely responding to the defense's argument.

E.    INEFFECTIVE ASSISTANCE OF COUNSEL

1.    *CONTENTION*

Defendant contends his trial counsel rendered ineffective assistance by failing to request an instruction that evidence of defendant's good character was sufficient, by itself, to raise a reasonable doubt about defendant's guilt (CALCRIM No. 350).

2.    *INEFFECTIVE ASSISTANCE OF COUNSEL LAW*

"'In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms."  [Citations.]  Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional

48

competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." [Citation.] If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." [Citations.] If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [Citation.]' [Citation.]" (*People v. Lopez* (2008) 42 Cal.4th 960, 966.)

### 3. *JURY INSTRUCTION*

CALCRIM No. 350 provides: "You have heard character testimony that the defendant (is a _____ *<insert character trait relevant to crime[s] committed>* person/ [or] has a good reputation for _____ *<insert character trait relevant to crime[s] committed>* in the community where (he/she) lives or works). [¶] Evidence of the defendant's character for _____ *<insert character trait relevant to crime[s] committed>* can by itself create a reasonable doubt [whether the defendant committed _____ *<insert name[s]of alleged offense[s] and count[s], e.g. battery, as charged in Count 1>*]. However, evidence of the defendant's good character may be countered by evidence of (his/her) bad character for the same trait. You must decide the meaning and importance of the character evidence. [¶] [If the defendant's character for certain traits has not been discussed among those who know (him/her), you

49

may assume that (his/her) character for those traits is good.]  [¶]  You may take that testimony into consideration along with all the other evidence in deciding whether the People have proved that the defendant is guilty beyond a reasonable doubt."

4.  *CHARACTER LAW*

A defendant's character or trait of his character may be testified to "in the form of an opinion" or evidence may be given "of his reputation."  (Evid. Code, § 1102.) Evidence of specific acts is not character evidence.  (*People v. Wagner* (1975) 13 Cal.3d 612, 618-619.)

5.  *ANALYSIS*

In the instant case, defendant's witnesses testified about specific acts.  Alexis testified she was defendant's student and he did not cause her to feel uncomfortable. Jennifer said defendant's comments to her about her toenails and being his daughter did not make her feel uncomfortable.  Shianne said she traveled with defendant for a student club and sometimes spent lunch periods in his classroom.  Shianne never heard defendant say anything inappropriate and never saw him do anything inappropriate. Kassandra testified that defendant never made her feel uncomfortable when she went to his classroom.  Areli heard defendant's "daughters/taking care" comment and it did not make her uncomfortable.

The witnesses did not give their opinions about defendant's character or testify about defendant's reputation in the community.  Rather, the witnesses testified about their specific experiences with defendant.  Therefore, the witnesses did not offer character evidence because evidence of specific acts is not character evidence.  (*People*

*v. Wagner*, *supra*, 13 Cal.3d at pp. 618-619.)  Accordingly, defendant's trial counsel provided competent assistance by not requesting the good character instruction, since there was not good character evidence.  In sum, trial counsel did not render ineffective assistance.

F.   CUMULATIVE ERROR

Defendant contends the cumulative prejudicial effect of the foregoing alleged errors requires reversal of his conviction.  We have found no errors, which includes no prejudicial errors.  Since there is nothing to cumulate, we are not persuaded by defendant's argument.  (See *People v. Hovarter* (2008) 44 Cal.4th 983, 1030 [rejecting a cumulative effect argument where no errors were found].)

G.   EQUAL PROTECTION

1.   *PROCEDURAL HISTORY*

Defendant filed a motion in the trial court seeking a declaration that a violation of section 647.6 is not a crime requiring mandatory registration as a sexual offender.  Defendant's argument was based upon principles of equal protection.  The prosecutor opposed the motion.  The trial court denied the motion.  Additionally, the court said that if the crime required discretionary (as opposed to mandatory) registration, then the trial court, in its discretion, would order defendant to register as a sexual offender, due to defendant taking advantage of a position of trust when committing the offense, i.e., the student/teacher relationship.

2. *ANALYSIS*

Defendant contends mandatory sexual offender registration for violating section 647.6 violates principles of equal protection. Defendant asserts a person convicted of violating section 647.6 is similarly situated to a person convicted of sexual crimes in which the victim is a willing party. The voluntary crimes do not require mandatory sexual offender registration. Defendant asserts "[t]here is no plausible reason" to have mandatory registration requirements for a violation of section 647.6, but discretionary registration requirements for defendants convicted of voluntary sexual intercourse or oral copulation with a minor.

In *People v. Hofsheier* (2006) 37 Cal.4th 1185, 1207 (*Hofsheier*), our Supreme Court concluded principles of equal protection were violated by laws requiring mandatory registration for defendants convicted of voluntary oral copulation with a minor who is 16 or 17 years old, but *not* imposing mandatory registration requirements for defendants convicted of voluntary intercourse with a minor who is 16 or 17 years old. In its reasoning, the Supreme Court explained, there was no rational basis for concluding people convicted of voluntary oral copulation were more likely to reoffend (thus requiring mandatory registration), than those convicted of voluntary sexual intercourse. Since there was no plausible reason for the disparate treatment, the court concluded the two groups must be treated the same. (*Id.* at pp. 1204, 1207.) The Supreme Court noted the Legislature could impose mandatory registration requirements for those convicted of voluntary intercourse, so the two groups would be treated equally. (*Id.* at p. 1207.)

In *Brandao*, *supra*, 203 Cal.App.4th at page 442, the defendant raised the same equal protection issue being raised in the instant case. The *Brandao* court noted *Hofsheier* had been extended by other appellate cases to include a variety of voluntary sexual activities between adults and minors of different ages and age differences. For example, it was extended to include voluntary sodomy with a 17 year old and voluntary digital penetration of a 13 year old. (*Brandao*, at pp. 443-444.) However, appellate courts had declined to extend *Hofsheier* in cases where (1) the offense involved a victim of a young age and/or the victim and the defendant were separated in age by 10 years or more; and (2) the offense involved a different specific intent than the *Hofsheier*-type offenses. (*Brandao*, at p. 444.)

The *Brandao* defendant argued he was similarly situated to the *Hofsheier*-type of defendants. (*Brandao*, *supra*, 203 Cal.App.4th at p. 445.) The defendant asserted a violation of section 647.6 is similar to a voluntary sex offense because section 647.6 does not require the defendant's conduct be forcible, it does not require touching, it requires only that the victim be under 18 years old, does not require a 10-year age difference, and is a general intent offense. The defendant conceded section 647.6 required the defendant to be motivated by a sexual interest in children, but argued this element did not undermine the similarities between section 647.6 defendants and the *Hofsheier*-type (voluntary offense) of defendants. (*Brandao*, at p. 445.)

The *Brandao* court reasoned that section 647.6 defendants were different than the *Hofsheier* (voluntary offense) defendants because section 647.6 requires conduct that is disturbing or unhesitatingly irritating to a reasonable person, while the voluntary

53

offenses involve "conduct between two willing parties." (*Brandao*, *supra*, 203 Cal.App.4th at p. 445.) The appellate court also concluded the motivation requirement of section 647.6 set it apart from the *Hofsheier* offenses, in that a section 647.6 defendant must be "motivated by an unnatural or abnormal sexual interest in children." (*Brandao*, at pp. 445-446.) In regard to age, the appellate court reasoned section 647.6 "encompasses the youngest of minors as well as perpetrators who are much older than their victims," which also differentiated the offense from the *Hofsheier* crimes. (*Brandao*, at p. 446.)

Due to the foregoing differences, the *Brandao* court concluded, "section 647.6, subdivision (a), simply is not comparable to the voluntary sex offenses at issue in *Hofsheier*-type cases, in which the only difference between the crimes was the nature of the sexual act and, in some cases, the ages of the defendant and the victim." (*Brandao*, *supra*, 203 Cal.App.4th at p. 446, fn. omitted.) The appellate court held defendants convicted of violating section 647.6 are not similarly situated to those convicted of *Hofsheier*-type offenses, and therefore the different treatment was rational and not a violation of equal protection. (*Brandao*, at p. 448.)

We agree with *Brandao's* reasoning and conclusion. Accordingly, we conclude mandatory sexual offender registration for a violation of section 647.6 does not violate equal protection.

Defendant asserts *Brandao* was wrongly decided because section 647.6 offenses could include voluntary conduct between two willing parties. Defendant reasons that section 647.6 requires a reasonable person to be disturbed or irritated by a defendant's

behavior, so arguably, the minor could be a willing participant (the minor does not need to be disturbed or irritated), and the minor could be 16 or 17 years old.  Further, in regard to the sexual motivation aspect of section 647.6, defendant asserts case law reflects "there can be no *normal* sexual interest in any child."  (*People v. Shaw* (2009) 177 Cal.App.4th 92, 103.)  Defendant reasons a person who engages in voluntary intercourse or oral copulation with a child is motivated by a sexual interest in a child, and under the law that interest cannot be normal.  Therefore, defendant contends a section 647.6 defendant could be similarly situated to a *Hofsheier*-type defendant, in that a section 647.6 defendant could commit an offense involving a 16 or 17 year old, where both parties are willing, and the motivation is the same.

Defendant's argument is not persuasive because he is raising a facial challenge to the statute, but supporting that contention with a hypothetical "as applied" argument. Our Supreme Court has explained, "A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual.  [Citation.]  '"To support a determination of facial unconstitutionality, voiding the statute as a whole, petitioners cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute . . . .  Rather, petitioners must demonstrate that the [statute's] provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions.'"  [Citation.]"  (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084.)  An "as applied" challenge to a statute "contemplates analysis of the facts of a particular case or cases to determine the

circumstances in which the statute or ordinance has been applied and to consider whether in those particular circumstances the application deprived the individual to whom it was applied of a protected right," e.g., equal protection. (*Id.* at p. 1084.)

Defendant's argument is premised upon section 647.6 being applied to a defendant whose victim was 16 or 17 years old, when the defendant was fewer than 10 years older than the victim, and where the victim was a willing participant in the defendant's conduct. Defendant's argument is dependent upon the statute being applied in a hypothetical scenario. Accordingly, defendant's argument is not persuasive because the hypothetical factual scenario is unrelated to the facts of this case. In this case, the victim was 15 years old, defendant was more than 10 years older than the victim, and arguably the victim was not a willing or voluntary participant since she said defendant's conduct made her "[e]xtremely uncomfortable." In sum, defendant's equal protection argument is not persuasive.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER                                   
                                                    J.

We concur:

McKINSTER                          
                    Acting P. J.

RICHLI                              
                    J.

56